STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

XPO LOGISTICS, INC.,

Plaintiff,

v.

JESSICA NORTHROP,

Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
CIVIL ACTION NO: 19-CVS-_____

13

**VERIFIED COMPLAINT AND MOTION
FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY
INJUNCTION**

Plaintiff XPO Logistics, Inc. ("XPO" or the "Company") alleges as follows:

## INTRODUCTION

1.  This action arises from Defendant Jessica Northrop's ("Northrop" or "Defendant") violation of the noncompetition, confidentiality and return-of-company property covenants set forth in her employment agreement with Plaintiff. On June 4, 2019, Northrop resigned from her position as XPO's Service Center Manager in East Syracuse, New York to take the same position at a new facility that a direct competitor was opening in the same market. Further, after Defendant had accepted a position with XPO's competitor, but while still employed at XPO, she sent multiple emails from her company email account to her personal email account containing XPO's confidential information and proprietary materials.

2.  XPO is a global transportation and supply chain solutions provider. XPO's less-than-truckload ("LTL") division, in which Northrop worked, is intensively competitive. XPO is a top-three provider of LTL services in North America.

3.  Defendant Northrop worked for XPO as the Service Center Manager for XPO's LTL facility in East Syracuse, New York.

4. In her role for XPO, as detailed below, Northrop managed all aspects of the operations of the Syracuse facility and its relationships with customers and carriers. In connection with this position, Northrop dealt directly with XPO's current and prospective customers and had access to XPO's confidential information, including pricing, operating costs and expenses, budgeting, customer data, needs and preferences, customer relations, proprietary technology, operational processes and tools and market strategy and performance.

5. In connection with her employment by XPO, Northrop agreed in a written Confidential Information Protection Agreement (the "Agreement") that, for a period of six months following termination of her employment, she would not perform services for a Competing Business in an area, division or segment that competes with XPO.

6. In the Agreement, she also promised that she would not, at any time, directly or indirectly, use, disclose or copy XPO's Confidential Information.

7. She also agreed to return all XPO Confidential Information and property, including any documents, data, computers, or other business equipment belonging to XPO, no later than the last day of her employment.

8. In violation of her contractual duties to XPO, Northrop is now working for Saia LTL Freight ("Saia") as the Terminal Manager for the facility it has just opened in Syracuse, New York. At that facility, Saia provides LTL services that compete directly with the LTL services provided by XPO. In her role, Northrop will perform the same or substantially the same services for Saia that she performed during her employment with XPO.

9. Moreover, the materials she secretly and unlawfully took from XPO will allow her to assist the competitor's start-up of its facility using XPO's confidential and proprietary information.

12220699

## PARTIES AND JURISDICTION

10.     Plaintiff XPO is a Delaware corporation with offices in Charlotte, North Carolina, and its corporate headquarters located in Greenwich, Connecticut.

11.     Upon information and belief, Defendant Jessica Northrop is a resident of New York.  As described in more detail below, she was employed by XPO or the company it acquired, Con-Way Freight, from 2009 until June 4, 2019.  Pursuant to the Agreement, Northrop consented to the exclusive jurisdiction of state and federal courts located in Mecklenburg County, North Carolina, where XPO has a substantial presence, and affirmatively waived any objection to personal jurisdiction or venue in those courts.

## XPO LOGISTICS, INC.

12.     XPO is a global leader in LTL transportation and constitutes one of the largest LTL providers in North America.  The LTL division utilizes 8,000 tractors, 25,000 trailers and more than 13,000 drivers, operating out of facilities such as the one for which Northrop served as the Service Center Manager.  XPO's coverage extends to every state, encompassing 99% of all U.S. zip codes, as well as cross-border transportation for shipments to and from Mexico, Puerto Rico and Canada.

13.     XPO operates a transportation network that includes over 75,000 next-day and two-day lanes and offers multimodal transportation and logistics solutions to its customers through the use of data-driven reporting and custom analytics.  It provides visibility and transportation management capabilities to its customers through its online LTL hub.

## NORTHROP'S AGREEMENT

14.     In connection with her employment by XPO, Northrop entered into the Agreement, which is attached to this Complaint as Exhibit 1.

15. In Section 1 of the Agreement, Northrop promised to use XPO's Confidential Information only for XPO's benefit and that, other than as required to fulfill her duties for XPO, she would not use, disclose or copy XPO's Confidential Information or assist any other person or entity to do so.

16. Section 2 of the Agreement requires Northrop to return all of XPO's Confidential Information and other property, including all information stored in electronic form, to XPO by the last day of her employment.

17. As used in the Agreement, "Confidential Information" means information not generally known or proprietary to XPO about its businesses, affairs, operations, products, services, client and carrier lists, pricing strategies, operating processes, business methods and procedures, information technology and information-gathering techniques and methods, business plans, financial affairs and other accumulated data. By way of illustration, the term "Confidential Information" includes: information about clients, carriers, and vendors; information about sales and marketing (including plans and strategies); information about other third parties with whom XPO does business; and data, analyses, compilations, forecasts, studies and other documents that contain Confidential Information that is not known to the public generally.

18. Northrop agreed, in Section 6 of the Agreement, that while employed by XPO, and for a period of six months thereafter, she would not call on, contact, solicit or otherwise take away or disrupt, XPO's relationship with any customers or carriers on whose accounts she worked, with whom she had regular contact or as to which she had Confidential Information.

4

19.     In Section 7 of the Agreement, Northrop promised that, while employed by XPO and for a period six months thereafter, she would refrain from performing services for a Competing Business (like Saia) in an area, division or segment that competes with XPO.

20.     Northrop also agreed, in Section 18 of the Agreement, that XPO would be entitled to an injunction restraining the breach of restrictive covenants contained in the Agreement without posting bond.

## NORTHROP'S EMPLOYMENT WITH XPO

21.     Since 2009, Northrop has worked in the LTL business for XPO or its predecessor, with access to the Company's Confidential Information. In April 2016, Northrup accepted a transfer from her position as Service Center Manager of a smaller XPO facility in Syosset, New York to Service Center Manager for the Syracuse facility. In connection with this transfer, Northrup – on April 4, 2016 -- signed the Agreement. She also received an annual salary increase of $9,285.12 in connection with this transfer and in consideration for signing the Agreement. She has served as the Service Center Manager for the Syracuse facility since April 10, 2016.

22.     As the Syracuse Service Center Manager, Northrop was responsible for the overall management and performance of the facility and its employees. Her duties included selling XPO's services to businesses; managing interaction with those customers; problem solving customer concerns; management of all employees; and management of all costs attributable to the facility, including vendor costs, maintenance, supplies, manpower planning and customer claims. Northrop had overall P&L responsibility for the Syracuse facility.

12220699

23.     In her role as Manager of the Service Center, she worked directly and closely with XPO's customers, assisting the account executive with obtaining new business and managing and addressing operational issues and problems with current XPO customers.

24.     Through her employment, Northrop became privy to XPO's proprietary Confidential Information regarding XPO's LTL business and customers, including business strategy, pricing, contracts, employee compensation, proprietary management and operational processes and competitive offerings.

25.     Northrop also used and obtained knowledge about XPO's unique and proprietary technology for managing transportation and communicating with customers. These technology tools, such as those related to routing systems, business intelligence systems and safety systems, provide XPO with advantages over its competitors in the LTL industry.    Northrup became familiar, as a part of her job duties for XPO, with XPO's confidential freight movement systems and procedures, as well as its corporate security procedures.

26.     Northrop also acquired significant Confidential Information about XPO's LTL business outside of her own facility.    For example, she participated in weekly meetings of managers in her district—comprised of 20 facilities in a seven-state territory—in which Confidential Information about the district's financial and operational performance, goals, strategy and challenges was addressed.    In connection with those meetings, XPO provided Northrop with a confidential "Business Information Report," which provided detailed data regarding the operations and financial performance, such as revenue, tonnage and yield, for all of the facilities in her district.

12220699

27.     Northrop also participated in weekly meetings with the leadership team in which she was provided with Confidential Information on certain designated topics, such as operations, financial issues, safety and staffing.

28.     Further, as a Facility Services Manager, Northrop had access to confidential financial and operational data for every LTL terminal in XPO's East region, one of four (4) LTL regions of XPO.  She also participated in a monthly "manager meeting" at which XPO's LTL executive leadership reviewed the financial performance and goals for XPO's entire LTL business.

29.     Because of the intensely competitive nature of the logistics industry, XPO closely guards this sensitive and proprietary Confidential Information.  XPO protects its Confidential Information by a secure computer network, accessible only to employees through password authentication and only for XPO's business purposes, and through confidentiality agreements and policies with its employees.  XPO's Confidential Information is not available to the public generally or to XPO's competitors.  Disclosure of the Confidential Information would damage XPO in a manner that would be difficult to calculate.

## DEFENDANT'S UNLAWFUL CODUCT

30.     XPO only recently learned that Northrop violated the Agreement by emailing to her personal email account XPO's proprietary materials and Confidential Information.

31.     Northrop is currently working for Saia, which directly competes with XPO in the LTL business.  According to its public filings, in May 2017, Saia implemented a strategy to begin serving new markets in the Northeast by opening new terminals in the region.  As part of that strategy, Saia opened up a LTL facility in Syracuse on or about June 17, 2019.

12220699

32.     On May 29, 2019, while working at XPO's Syracuse terminal, Northrop received a written offer from Saia LTL Freight to serve as the Terminal Manager for its newly opened Syracuse terminal. She accepted the offer that same day.

33.     XPO recently completed a forensic examination of Northrop's XPO email account and discovered that, on the same day she accepted Saia's offer of employment, she secretly emailed to her personal email account multiple XPO materials containing proprietary management tools and Confidential Information.

34.     Based on its investigation to date, XPO has learned that on May 29 and 31, 2019, Northrop emailed the following XPO documents to her personal email account, jln731@yahoo.com:

(a)     "Third Quarter Update.pptx" (PowerPoint presentation)

(b)     "Q4Playbook.xlsx" (Excel spreadsheet)

(c)     "Conference Report" form

(d)     "SWFL matter.xlsx" (Excel spreadsheet)

(e)     "SCM Responsibilities and Expectations.xlsx" (Excel spreadsheet)

(f)     "Pre-shift template.xlsx" (Excel spreadsheet)

(g)     "Copy of DockXSY.xls" (Excel spreadsheet)

(h)     "XSY Employee_Training_Record_Spreadsheet_xlsx" (Excel spreadsheet)

35.     The XPO documents that Northrop emailed to herself constituted confidential and proprietary information about XPO's business, including its operations, business strategy, customers and financial information.

36.     For example, the "Third Quarter Update" is a proprietary tool that XPO uses to communicate operational and performance information to its employees. It also includes

confidential substantive information, such as competitively sensitive information about the company's incentive plan for its employees.

37. The "Q4 Playbook" was provided to Northrop in connection with the weekly meeting with the leadership team discussed above. It is a proprietary management tool that XPO developed and that is designed to identify and execute strategies and actions to drive improvements across all aspects of an LTL facility's business. XPO believes that the development and use of this management tool provides it with a competitive advantage in the LTL industry.

38. Northrop also took other XPO documents and forms that XPO developed to assist its managers in effectively and efficiently managing the facility's operations and its workforce.

39. Taken together, the confidential materials she took from XPO provide her with a ready-made "starter kit" to open up and manage the operations of a new facility, such as the one where she is now working. Northrop and her employer will obtain an unfair and improper advantage if Northrop is allowed to retain and utilize XPO's information, processes and materials as they compete in the same market.

40. Northrop had no lawful or business purpose for sending to her personal email account XPO's Confidential Information pertaining to XPO's business. Northrop's purpose in forwarding the XPO information was not to further the business interests of XPO, but so that Northrop could use the information and materials to provide her with shortcuts as she began managing the new Saia facility through the use of XPO's own business information and forms.

41. On June 4, 2019, Northrop resigned from XPO and her employment terminated.

42. Northrop did not return the XPO materials she had emailed to her own personal account or disclose to XPO that she had taken the documents. Absent its own investigation,

XPO may never have learned that its former employee and direct competitor intended to use XPO materials and Confidential Information to compete against it in the same market.

43.     XPO's competitor, by hiring XPO's terminal manager to serve as its terminal manager in the same location and by virtue of the ability to access XPO's Confidential Information, including as set forth in the materials identified above, would obtain an unfair competitive advantage.

44.     By letter dated June 13, 2019 (attached hereto as Exhibit 2), XPO demanded that Northrop comply with her obligations under the Agreement. Northrop did not respond.

45.     Accordingly, to prevent continued irreparable harm from Northrop's violation of her noncompetition, confidentiality and return-of-property covenants, XPO has been compelled to file this lawsuit to obtain injunctive relief restraining the Defendant from further unlawful actions.

## COUNT I
## BREACH OF CONTRACT

46.     The allegations of the preceding paragraphs of this Complaint are incorporated by reference and realleged as if fully set forth herein.

47.     The Agreement is a valid, binding, and enforceable contract between Northrop and XPO.

48.     Northrop has breached her obligation not to perform services for a Competing Business in an area that competes with XPO

49.     Northrop has breached the Agreement by taking without authorization XPO's Confidential Information and property for her own benefit and use and by failing to return XPO's Confidential Information and property by no later than her last day of employment.

10

50.     Northrop's conduct also constitutes a breach of the covenant of good faith and fair dealing implied in the contract between the parties.

51.     As a direct and proximate result of these actions, XPO has been damaged and is entitled to the relief set out below.

### COUNT II
### VIOLATION OF THE NORTH CAROLINA UNFAIR
### AND DECEPTIVE TRADE PRACTICES ACT

52.     The allegations of the preceding paragraphs of this Complaint are incorporated by reference and realleged as if fully set forth herein.

53.     As described above, Northrop has engaged in conduct constituting unfair competition and unfair or deceptive acts or practices in violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1.

54.     Northrop's actions in this regard were in and affecting commerce.

55.     Northrop's actions were unethical and unscrupulous and she acted in a manner that was designed to and did deceive XPO.

56.     Northrop's actions proximately caused injury to XPO, and XPO was damaged and is entitled to the relief as set out below, including trebled damages and attorneys' fees pursuant to Chapter 75-1 of the North Carolina General Statutes.

### MOTION FOR TEMPORARY RESTRAINING ORDER
### AND  PRELIMINARY INJUNCTION

57.     The allegations of the preceding paragraphs of this Complaint are incorporated by reference and realleged as if fully set forth herein.

58.     Pursuant to North Carolina Rule of Civil Procedure 65, XPO is entitled to, and seeks, a temporary restraining order and preliminary injunctive relief prohibiting Northrop from violating her non-competition, confidentiality and return-of-property obligations. Unless so

11

enjoined, Northrop's actions will cause irreparable harm to XPO and will cause injuries that cannot be adequately compensated by monetary damages. Unless enjoined, the injury to XPO is immediate and pressing, and a temporary restraining order and preliminary injunctive relief are necessary to preserve the status quo, to protect XPO's rights, and to prevent injury to XPO pending the trial of this action.

59.     Specifically, XPO is entitled to, and seeks, the following temporary and preliminary injunctive relief until the final disposition of this matter:

(a)     prohibiting Defendant from performing services for a Competing Business, including Saia, in an area, division or segment that competes with XPO;

(b)     prohibiting Defendant from using or disclosing XPO's Confidential Information or assisting any other person in doing so;

(c)     prohibiting Defendant from accessing, disclosing, destroying, removing, transferring, copying, sharing or altering any documents or tangible things that constitute Confidential Information or that belong to XPO, including without limitation computer files and other electronic data;

(d)     immediately compelling Defendant to provide for inspection and imaging any electronic devices in her possession, custody, or control that currently or previously contained Confidential Information or other documents or information relating to XPO's business, including without limitation any personal media or storage drives;

(e)     compelling Defendant immediately to return any Confidential Information to XPO; and

12

(f)     awarding XPO any such other and further relief as appropriate.

## PRAYER FOR RELIEF

**WHEREFORE,** XPO respectfully requests the Court to:

1.      Enter a preliminary injunction and temporary restraining order pursuant to Rule 65 of the North Carolina Rules of Civil Procedure and N.C. Gen. Stat. § 66-154: (a) prohibiting Defendant from performing services for a Competing Business, including Saia, in an area, division or segment that competes with XPO; (b) prohibiting Defendant from using, disclosing, accessing, or copying any of XPO's Confidential Information and trade secrets or assisting any other person in doing so; (c) prohibiting Defendant from accessing, disclosing, destroying, removing, transferring, copying, sharing or altering any documents or tangible things that constitute Confidential Information or that belong to XPO, including without limitation computer files and other electronic data; (d) immediately compelling Defendant to provide for inspection and imaging any electronic devices in her possession, custody, or control that currently or previously contained Confidential Information or other documents or information relating to XPO's business, including without limitation any personal media or storage drives; and (e) compelling Defendant immediately to return any Confidential Information to XPO.

2.      Award XPO compensatory damages, together with punitive damages;

3.      Award XPO treble the actual damages caused by Defendant's conduct pursuant to N.C. Gen. Stat. § 75-16;

4.      Award XPO its reasonable attorneys' fees; and

5.      Award XPO such other and further relief as this Court deems proper.

12220699

This _27th_ of June, 2019.

David C. Wright, III
N.C. Bar No. 11161
dwright@robinsonbradshaw.com

Douglas M. Jarrell
N.C. Bar No. 21138
djarrell@robinsonbradshaw.com

Gabriel Wright
N.C. Bar No. 52472
gwright@robinsonbradshaw.com

**Robinson, Bradshaw & Hinson, P.A.**
101 North Tryon Street, Suite 1900
Charlotte, North Carolina 28246-1900
Telephone: 704-377-2536
Facsimile: 704-378-4000

*Attorneys for Plaintiff*

14

**STATE OF NEW HAMPSHIRE**

**ROCKINGHAM COUNTY**

## VERIFICATION

James J. Byrne, being first duly sworn, deposes and says that he is the District Network Senior Manager for XPO LOGISTICS, INC., the plaintiff in the foregoing action, and that he has read the foregoing Verified Complaint and knows the contents thereof, based upon information known to him personally, information set forth public sources and information provided to him by persons with personal knowledge, and the same is true of his own knowledge, except as to those matters therein stated upon information and belief, and as to those matters he believes them to be true.

Subscribed and Sworn to
before me this 2-7 day
of June 2019.

_____
Notary Public

My Commission Expires: _6-21-2022_

[NOTARIAL SEAL]

DAVE NAPIER
MY
COMMISSION
EXPIRES
JUNE 21, 2022
NOTARY PUBLIC
NEW HAMPSHIRE



EXHIBIT

1

## CONFIDENTIAL INFORMATION PROTECTION AGREEMENT

In this CONFIDENTIAL INFORMATION PROTECTION AGREEMENT (the "*Agreement*"), the terms "*we*," "*us*," "*our*," and "*the Company*" mean, collectively, XPO LOGISTICS, INC., a Delaware corporation, together with its existing and future subsidiaries and controlled affiliates. "*You*," "*your*," "*me*" and "*the Employee*" mean the specific individual whose signature appears on the last page of this Agreement. To help explain the obligations created under this Agreement, we use certain capitalized terms (e.g., "*Confidential Information*," "*Cause*," etc.), which are defined (in alphabetical order) in Section 20, below.

### Background Information

This Agreement is a condition of your employment by the Company or one of its subsidiaries or controlled affiliates. You acknowledge that we are employing you in consideration for your execution and delivery of this Agreement.

We are a third-party transportation, logistics, less-than-truckload and asset-based carrier business. Our customer and carrier lists, pricing strategies, operating processes, methods and procedures, our information technology, our training programs, our business plans, and our other highly confidential or proprietary information are of vital importance to us. We therefore need to be sure that our employees agree to protect the Company regarding these matters, including, for example, our Confidential Information, our intellectual property, returning Company property upon our request, not trying to hire away our employees, not competing with us, not soliciting our customers, not saying bad things about us, and certain other matters as set forth in this Agreement.

### Agreement

In consideration of the Background Information above (which constitutes an important part of this Agreement) and for other good and valuable consideration, the receipt and sufficiency of which are hereby mutually acknowledged, you and the Company agree as follows:

1.  *Confidentiality Covenant.* You agree to use our Confidential Information only for our benefit. You agree that other than as required by you to perform your duties for us, you will not, at any time, directly or indirectly use, disclose or copy our Confidential Information (including to personal email or storage media) or assist any other person or entity to do so. You also agree to immediately call to the attention of the Company any facts suggesting that any person or entity is or may be misusing or improperly disclosing Confidential Information.

2.  *Return of Company Property When Requested.* You agree to promptly return to us when we request, but in any event by the last day of your employment with us, all of our Confidential Information and all other Company property (tangible or intangible) in your possession or control (e.g., all documents, data, recordings, smartphones, computers and other business equipment, inclusive of all information stored in electronic form), obtained or prepared by or for and utilized by you in the course of your employment, all of which you acknowledge and agree is and shall remain our sole and exclusive property. You further agree not to tamper with, alter, delete or destroy any Company property, documents, records, data contained in any location, including but not limited to any information contained on any Company-provided computer or electronic device, system, database, server, portal or network, including but not limited to re-setting electronic devices to their default settings. In addition, you agree not to access or attempt to access any electronic device, system, database, server, portal or network of the Company after your employment ceases.

**3.** *Ownership of Intellectual Property.* Except as otherwise provided by applicable law, you agree that all *"Work Product"* (as that term is defined in Section 20) created in whole or in part by you while employed by us is our exclusive property, and that you will promptly, fully and effectively communicate all Work Product to us. Accordingly, you agree that all Work Product eligible for any form of copyright protection made or contributed to in whole or in part by you within the scope of your employment while so employed shall be deemed a *"work made for hire"* under the copyright laws and shall be owned by us, and that the Company may sell, use, copy, reproduce, display, perform or alter as it sees fit, without any further right or claim by or remuneration to you. To that end, you hereby now (and upon our request, in the future you will) assign, transfer and convey to us, all of your *"Proprietary Rights"* (as that term is defined in Section 20) in all Work Product for our exclusive ownership and use, together with all rights to sue and recover for past and future infringement or misappropriation thereof. In addition, at our request, at all times while you are employed by us and at all times thereafter, you agree to promptly and fully assist us in effecting the foregoing assignment, including but not limited to the further acts of executing any and all documents necessary for us to secure for ourselves such Proprietary Rights in all such Work Product. YOU ARE HEREBY ADVISED, HOWEVER, THAT THE FOREGOING PROVISIONS DO NOT APPLY TO any invention (i) for which none of our equipment, supplies, facilities or Confidential Information were used, and (ii) developed entirely on your own time, unless the invention relates to our businesses or any actual or demonstrably anticipated research or development, or results from any work performed by you for us.

**4.** *No Conflicting Business Opportunities.* While employed by us, you may acquire knowledge of either (i) information that is relevant to the business of the Company or (ii) knowledge of business opportunities pertaining to the business(es) in which the Company is engaged. In such case, you agree to promptly disclose to the Company such information or business opportunities and agree not to disclose such information to third parties without our express written consent.

**5.** *Covenant Not to Hire the Company's Employees and Others.* While employed by us and for two (2) years thereafter, you agree not to directly or indirectly hire or interfere (or try to hire or interfere) in any way with (or help any other person or party to (or to try to) hire or in any way to interfere with) our relationship with (i) any of our employees, (ii) any of our independent contractors (iii) any employee of a third party that has an "independent participant" relationship with us and (iv) any person who at any time during the six (6) months prior to such hiring or interference was described by clauses (i), (ii) or (iii) of this paragraph. This undertaking on your part for our benefit is called your *"Anti-Hiring Covenant."*

**6.** *Covenant Not to Solicit the Company's Restricted Customers and Carriers.*

(a)   *Agreement Not to Solicit.* While employed by us and for the two (2) years thereafter, you agree that you will not (nor will you assist any other person or entity to), for any reason, either directly or indirectly, call on, contact, solicit or otherwise take away or disrupt, or attempt to call on, contact, solicit or otherwise take away or disrupt, our relationship with or business expectancy from any of our customers or carriers (i) on whose account you worked or with whom you had regular contact, or (ii) as to whom you had access to Confidential Information (in either instance at any time within the last one (1) year of your employment with us). This undertaking on your part for our benefit is called your *"Non-Solicit Covenant."*

(b)   *You Acknowledge the Legitimacy, Reasonableness and Fairness of Your Non-Solicit Covenant To Us.* You acknowledge that: (i) in the course of performing your duties as an employee who has had and/or will have direct contact with our customers or carriers and/or access to proprietary information about them, you will have access to, and be regularly exposed to, and in some cases will

generate and control, Confidential Information which is sensitive, and competitively valuable information about us; (ii) we have developed our Confidential Information through considerable time, effort and expense; (iii) our relationships with our customers, carriers, vendors, suppliers, business partners and employees, as well our Confidential Information, constitute valuable and legitimate protectable business interests of ours; (iv) your Non-Solicit Covenant is reasonable and necessary to protect those interests, our Confidential Information and our goodwill; and (v) your compliance with your Non-Solicit Covenant following termination of your employment will not prevent you from earning a livelihood in a business similar to our business, but, in any event, your experience and capabilities are such that you now have and will have other opportunities to earn a livelihood and adequate means of support for yourself and your dependents.

7. *Covenant Not to Compete with Us.*

(a) *Duration and Geographic Scope.* While you are employed by us and for a period of six (6) months after your employment ends, whether on account of your resignation or because we terminated your employment with or without Cause, (the "*Restricted Period*"), you are not allowed to compete with us in the "*Restricted Territory*" (geographic area) fixed below. This undertaking on your part for our benefit is called your "*Non-Compete Covenant*."

(b) *Your Non-Compete Covenant to Us.* Subject to the Restricted Period extension and Non-Compete Covenant waiver provisions described below, you expressly agree that both while employed by us and during the Restricted Period, you will not (either directly or indirectly through others) have any of the following business relationships anywhere within your Restricted Territory:

(i) perform any services, whether as an employee, agent or independent contractor, for a "*Competing Business*" (defined below) in an area, division or segment of the Competing Business that competes in any way with any of our businesses;

(ii) own any financial interest in a Competing Business (e.g., as a partner, member, principal, shareholder or other owner (other than a holder of less than 1% of the outstanding voting shares of any publicly held company)); or

(iii) loan money to, borrow money from, lease to, or have any other financial dealings with a Competing Business (except for ownership of less than 1% of the outstanding voting shares of any publicly held company).

(c) *Definition of a "Competing Business".* You and the Company agree that a "*Competing Business*" means any individual or business (e.g., a corporation, partnership or limited liability company) engaged in our business as we are conducting it on the date your employment with us ends (including any business we are then actively considering or were considering at any time during the 12 month period ending on the date of your termination), including by way of example:

(i) any providers of less-than-truckload, truckload, or other motor carrier freight transportation services, including (only by way of example) but not limited to FedEx Freight, UPS, YRC, Roadway, Old Dominion, and Schneider;

(ii) any providers of third-party logistics services, including only by way of illustration, freight brokerage, freight forwarding, expediting, internet load boards, last-mile delivery logistics, contract logistics or intermodal providers, or firms such as CH Robinson, UPS, Coyote Logistics, Expeditors International of Washington, Inc., Echo Global Logistics Inc., Total

Quality Logistics, Roadrunner Transportation Systems, TransCore, Internet Truckstop LLC, syncreon, Neovia Logistics and Hub Group Inc.;

(iii)  any entity that engages in or may engage in acquisition related or mergers and acquisition activities related to the transportation or third-party logistics industry, including, without limitation, researching, analyzing and evaluating companies for possible investment in or acquisition of, for itself or clients; and

(iv)  an individual or business that otherwise competes with our business anywhere in the Restricted Territory.

(d)  *Your Restricted Territory.* You agree that your "*Restricted Territory*" means:

(i)  the territory within one hundred (100) miles from the principal office at which you are employed by us;

(ii)  the territory within fifty (50) miles from any of our other offices in the United States, Canada and Mexico; and

(iii)  any state or province in the United States, Canada and Mexico in which our customers are located or we perform services for or on behalf of our customers or carriers.

(e)  *Your Non-Compete Payments if We Terminate You Without Cause.* While the primary consideration for your grant of your Non-Compete Covenant to us is our employment of you, as additional consideration to you for your entering into this Agreement with us, if we terminate your employment *without* Cause (i.e., your employment termination was not on account of your quitting or the Company's terminating your employment for Cause), then we will make "*Non-Compete Payments*" to you, ratably over the six (6) month post-employment Restricted Period in accordance with our normal payroll policies, each in an amount calculated as set forth in subsection (i) below, upon the condition that you first furnish us with a written general release in a form acceptable to us in our sole discretion.

(f)  *Additional Non-Compete Payments and Extension of Your Restricted Period:* We have the right, at our discretion, to extend your Restricted Period for up to eighteen (18) consecutive months in three (3) consecutive six-month extensions, but if we do so, we will make additional payments to you during that time, as described in subsection (j)(i) below ("*Additional Non-Compete Payments*").

(g)  *Our Right to Waive Your Non-Compete Covenant and Avoid Non-Compete Payments:* We recognize that our termination of your employment without Cause may occur at a time when then-relevant specific circumstances surrounding your termination and/or other business considerations cause us to conclude we do not need your Non-Compete Covenant. For that reason, we reserve the right to waive your Non-Compete Covenant, and if we elect to do so, you agree that no Non-Compete Payment will be due or payable to you.

(h)  *Written Notice on Employment Termination – We Let You Know Whether You Are Bound by the Non-Compete Covenant:* If we terminate your employment, it will be by written notice to you and indicating the effective date of your termination, by which we will either advise you (x) of your six (6) month Non-Compete Covenant and the amount of your Non-Compete Payment(s), if any, or (y) alternatively, of our election to waive your Non-Compete Covenant.

     (i)    *Amount and Timing of Non-Compete Payments During Six (6) Month Restricted Period.* If we terminate your employment without Cause and do not elect to waive your Non-Compete Covenant, the dollar amount of your monthly Non-Compete Payments will depend on the number of full calendar months you have been employed by us. During the post-employment Restricted Period, the aggregate amount that we will pay you, if applicable, will equal one (1) month of your *"Average Monthly Compensation"* for each full calendar month you were employed by us, up to a maximum of six (6) calendar months but not less than one (1) month. This sum will be paid to you over the six (6) month Restricted Period in accordance with our payroll procedures on our normal pay periods. *"Average Monthly Compensation"* means your average monthly salary and incentive compensation you earned from us during the twelve (12) calendar months immediately preceding your termination date (or shorter period, if you were with us for less than twelve (12) months).

     (j)    *Additional Non-Compete Payments For Six (6) Month Extensions of Restricted Period:* If we exercise our rights to extend your Restricted Period beyond its original six (6) month term, we will give you written notice of our first election not less than thirty (30) days before the expiration of the initial six (6) month Restricted Period, and, again at our election, by giving you written notice of our second and/or third extension election(s) not less than thirty (30) days before the expiration of the prior extension(s).

     (i)    If we exercise these Restricted Period extension options, we will pay you *"Additional Non-Compete Payments"* for each month of that extension period (prorated for partial months), each in an amount equal to your Average Monthly Compensation, in accordance with our payroll procedures on our normal pay periods.

     (ii)    You agree that if we elect to extend the Restricted Period, any money you earn for performing services for anyone else after the first six (6) months of the Restricted Period, whether as an employee or as an independent contractor, will reduce, dollar-for-dollar, the aggregate amount of the Additional Non-Compete Payments we will pay to you. Accordingly, you agree to promptly disclose to us the amount of any such earned income at any time within three (3) years following the date of your termination of employment.

     (k)    *You Acknowledge the Legitimacy, Reasonableness and Fairness of Your Non-Compete Covenant To Us.* You acknowledge that: (i) in the course of performing your duties for us you will have access to and will become highly knowledgeable about our Confidential Information; (ii) your Non-Compete Covenant is essential to protect our business and goodwill because were you to enter into activities competitive with our business you would cause us substantial harm not only because of your post-employment activities, but because of the impact those activities might have on our other employees and former employees); and (iii) although your compliance with your Non-Compete Covenant may prevent you from earning a livelihood in a business similar to our business, your experience and capabilities are such that you now have and will have other opportunities to earn a livelihood and adequate means of support for yourself and your dependents.

     (l)    *Consequences of Your Breach of Your Non-Compete Covenant:* We reserve the right to use any remedies available to us in law or in equity to enforce our rights under this Agreement, generally, and your Anti-Hiring Covenant, Non-Compete Covenant, Non-Solicit Covenant and other covenants to us set forth in this Agreement, specifically. However, in addition to any other legal remedies we may be entitled to, you agree that if you breach your Non-Compete Covenant to us, you will repay us all of the Non-Compete Payments we have made to you (net of any taxes paid by you on such payments).

(m)    *Coordination with Other Benefits.*  To the extent you are eligible for any other severance or separation benefit ("severance"), you will be entitled to the greater of the severance or the Non-Compete Payments, but not both, and such payment shall be deemed to satisfy our obligations to make the Non-Compete Payments under this Agreement.

**8.  *Adherence to Company Policies for the Avoidance of Questionable Transactions.*** You agree that while employed by us, you will not enter into any written or verbal agreement or understanding with anyone else, whether a customer, employee, independent contractor or vendor of the Company or otherwise, directly or indirectly providing for the disbursement or receipt of any payments: (a) which involve any illegal purpose, or (b) which involve (i) illegal contributions or other distributions to any other private persons, government officials or employees, political candidates or parties, or (ii) kickbacks or bribes to any person. Further, to the extent within your control, while employed by us you will act to ensure that (i) the documentation of all of our business transactions in which you are involved properly describe the pertinent events, and (ii) the transaction records thereof are not false, distorted or misleading.

**9.  *Refraining from Disparaging Us.*** While employed by us and thereafter, you agree never to disparage, malign or impugn us or any of our officers, directors and employees.

**10.  *Cooperating After Employment Ends.*** While employed by us and thereafter, you agree to fully cooperate with us in connection with any investigation, suit, action or proceeding in which you may have relevant information or testimony, including but not limited to providing testimony at depositions or trial, which cooperation and appearance you fully agree to without the necessity of a subpoena or court order. If your assistance is required after your employment has ended, we will reimburse you for your reasonable expenses and accommodate your personal and business schedule to the extent practicable.

**11.  *Giving Notice to a New Employer.*** You agree that for a period of two (2) years after the termination of your employment, you will provide any new employer written notice of each of the restrictions to which you are subject under this Agreement (e.g., your Anti-Hiring Covenant, your Non-Solicit Covenant and your Non-Compete Covenant) before you accept an offer of employment and concurrently provide to us a copy of each such written notice.

**12.  *Prohibited Use of Confidential Information of Your Prior Employers.*** It is vital to us that you not disclose to us or use any information or materials that might constitute a former employer's confidential information you obtained while employed by that former employer. Accordingly, you (a) agree not to disclose or use any former employer's confidential information in any form unless you first obtained the prior written consent of that former employer, and (b) represent to us that you searched for and deleted any emails, documents or files prepared, generated, obtained or used by you that contain any such confidential information of a prior employer.

**13.  *Authority to Enter into this Agreement; No Conflicts.*** You represent that you have the right to enter into this Agreement, that doing so is not and does not conflict with or breach any obligations you may have under any agreement you have or any court order, and that your signature on this Agreement makes it our valid and binding obligation, fully enforceable in accordance with its terms.

**14.  *Prior Restrictive Covenant Agreements to Which You Are Bound.*** You represent to us that you: (a) have provided us true, correct and complete copies of any agreement to which you are subject containing non-competition, non-solicitation or similar restrictions or covenants in favor of any prior employer or other party; and (b) are free to enter into this Agreement and be employed by us in accordance with the terms of this Agreement without breaching or violating any such prior agreements.

**15.** *Employee Acknowledgements Regarding Termination for Cause.* You acknowledge that your breach of your representations, covenants and agreements set forth in Sections 1 through 14 hereof is grounds for immediate termination for Cause by us. You agree that if, subsequent to termination of your employment for any reason (but in no event more than six (6) months after the date of termination of your employment), we determine in good faith that we could have terminated your employment for Cause, or we discover a breach of any provision herein, your employment shall, at our election, be deemed to have been terminated for Cause retroactively to the date your employment terminated.

**16.** *Termination Certificate.* Immediately following your termination of employment for any reason other than on account of your death or total disability, you will promptly return to us all of our property, as required by the provisions of Section 2, and you will concurrently execute and deliver to us a termination certificate, in a form acceptable to us in our sole discretion, regarding matters such as your return of our property and your compliance, both at the time of termination and thereafter, with your obligations under this Agreement.

**17.** *Employment At-Will.* As explained in your employment offer, you are employed at-will. Nothing in this Agreement changes your at-will employment status or confers any right with respect to continuation of employment, and nothing in this Agreement interferes in any way with the Parties' right to terminate the employment relationship at any time, with or without Cause or advance notice.

**18.** *Governing Law; Arbitration; Consent to Jurisdiction; and Waiver of Jury Trial.*

(a)    *Governing Law:* This Agreement shall be governed by and construed in accordance with its express terms, and otherwise in accordance with the laws of the State of North Carolina without reference to its principles of conflicts of law.

(b)    *Arbitration of Claims Initiated by You:* Any claim you wish to initiate arising out of or relating to this Agreement, the breach thereof, your employment with us, or the termination of that employment will be resolved by binding arbitration before a single arbitrator in the City of Charlotte, North Carolina administered by the American Arbitration Association in accordance with its Labor, Employment & Elections Arbitration Rules, and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

(c)    *Claims by Us Initiated by Us:* Any claim initiated by us arising out of or relating to this Agreement, the breach thereof, your employment or its termination, shall, at our election, be resolved in accordance with Sections 18(b) or 18(d), in our sole discretion.

(d)    *Consent to Jurisdiction and Waiver of Jury Trial:* You hereby irrevocably submit to the jurisdiction of any state or federal court located in Mecklenburg County, North Carolina; provided, however, that nothing herein shall preclude us from bringing any suit, action or proceeding in any other court, including without limitation for the purposes of enforcing the provisions of this Section 18 or enforcing any judgment or award obtained by us. You waive, to the fullest extent permitted by applicable law, any objection you now or hereafter have to personal jurisdiction or to the laying of venue of any such suit, action or proceeding brought in an applicable court described in this Section 18(d), and agree that you will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any court. You further agree that, to the fullest extent permitted by applicable law, a final and non-appealable judgment in any suit, action or proceeding brought in any applicable court described in subsection (d) shall be conclusive and binding upon you and may be enforced in any other jurisdiction. To the extent that, notwithstanding Section 18(b), you bring an action in any court, you agree to do so exclusively in the state or federal court located in Mecklenburg County, North Carolina, provided that

nothing herein shall waive the Company's right to demand that you comply with Section 18(b). YOU EXPRESSLY AND KNOWINGLY WAIVE ANY RIGHT TO A JURY TRIAL IN THE EVENT THAT ANY ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE BREACH THEREOF, OR YOUR EMPLOYMENT, OR THE TERMINATION THEREOF, IS LITIGATED OR HEARD IN ANY COURT.

19. *Remedies; Injunctions for Breaches of this Agreement.* All of Company's rights and remedies may be exercised alternatively or cumulatively to the fullest extent permitted by law. You acknowledge that in addition to the acknowledgements you made in Sections 5, 6 and 7 of this Agreement, you have considered each of the other restrictive covenants set forth in this Agreement and stipulate that those covenants are likewise reasonable and necessary to protect us and our Confidential Information, business strategies, employee and customer relationships and goodwill, now existing or to be developed in the future. You hereby: (i) agree to comply with all of the restrictive covenants, (ii) waive any right to contest the reasonableness, validity, scope or enforceability of any of the restrictive covenants, or any other claim or defense related thereto; (iii) agree that injunctive relief would be the most practical and efficient remedy for us in the event of your breach; and (iv) agree that the Company, without having to post bond or prove a lack of an adequate remedy at law, shall be entitled to injunctive relief against any breach by you of a restrictive covenant, <u>provided that</u> the foregoing shall not prejudice our rights to require you to account for and pay over to us any compensation, profits, gains, or derived by you related to the breach, and you agree to be so responsible for such an accounting. You further agree that if you violate your Anti-Hiring Covenant, your Non-Compete Covenant, and/or your Non-Solicit Covenant set forth in Sections 5, 6 and 7 of this Agreement, respectively, the post-employment restricted time period therein set forth shall be extended by a period of time equal to that period beginning when your activities constituting such violation commenced and ending when such violative activities terminated.

20. *Definitions.* This Agreement uses the following defined terms; they are intended to have the broadest meaning allowed by law to afford us the greatest protection.

"*Cause*" shall mean, in connection with your employment, (1) your dereliction of duties, failure to perform your duties hereunder, or refusal or repeated failure to follow any lawful rules or directive of the Company; (2) abuse of or dependency on alcohol or drugs (illicit or otherwise) that adversely affects your performance of duties for us; (3) commission of any fraud, embezzlement, theft or dishonesty, or any misappropriation of money or other Company assets; (4) breach of your fiduciary duties to us; (5) any act, or failure to act, in bad faith to our detriment; (6) failure to cooperate in good faith with a governmental or internal Company investigation or any of our directors, managers, officers or employees, if your cooperation is requested; (7) conviction of, or plea of *nolo contendere* to, a felony or any serious crime; or (8) your material breach of any representation, warranty or agreement created by this Agreement or any of our policies.

"*Confidential Information*" means all information, written (whether generated or stored on magnetic, digital, photographic or other media) or oral, not generally known, or proprietary to us about our businesses, affairs, operations, products, services, customer and carrier lists, pricing strategies, operating processes, business methods and procedures, information technology and information-gathering techniques and methods, business plans, financial affairs, and all other accumulated data, listings, or similar recorded matter useful in the businesses of the Company, including by way of illustration and not limitation:

- information about the business, affairs or operation of the Company developed by you or which is furnished to you by us during your employment;
- operating instructions, training manuals, procedures, and similar information;

- information about customers, carriers, vendors and other with whom we do business (e.g. customer, carrier or vendor lists, pricing, contracts, and activity records);
- information regarding the skills and compensation of employees or contractors of the Company;
- information about sales and marketing (e.g., plans and strategies);
- information about any other third parties we have a business relationship with or owe a duty of confidentiality; and
- all notes, observations, data, analyses, compilations, forecasts, studies or other documents prepared by you that contain or reflect any Confidential Information and which is not known to the public generally other than as a result of your breach of this Agreement.

However, the Company expressly acknowledges and agrees that the term "Confidential Information" excludes information which (A) is in the public domain or otherwise generally known to the trade, or (B) is disclosed to third parties other than by reason of your breach of your confidentiality obligations under this Agreement or (C) is learned of by you after the termination of your employment from any other party not then under an obligation of confidentiality to us.

   *"Proprietary Rights"* means all right, title and interest regarding all inventions, ideas, improvements, designs, processes, trademarks, service marks, trade names, trade secrets, trade dress, data, discoveries, Work Product, and any other proprietary assets or rights.

   *"Work Product"* means all works of authorship, research, discoveries, inventions and innovations (whether or not reduced to practice or documented), improvements, developments, methods, designs, analyses, drawings, reports and all similar or related information (whether patentable or un-patentable, and whether or not reduced to writing), trade secrets and Confidential Information, copyrightable works, and similar and related information (in whatever form or medium). As examples, this definition applies to anything to do with the Company's actual or anticipated business, research and development or existing or future products or services. It applies to the results from any work performed by you for us. It also applies to anything conceived, developed, made or contributed to in whole or in part by you while employed by us.

### 21. *Other Agreements.*

   (a)   *Notices.*  Except as otherwise provided, we can give you notice at your last known principal residence listed on our records. You, in turn, may give us notice to XPO Logistics, Inc., Five Greenwich Office Park, Greenwich, CT 06831, Attention: Chief Legal Officer. Either you or the Company may provide another address for notice by written notice to the other. Notice is deemed given as follows: when delivered personally; four (4) days after it is mailed by registered or certified mail, postage prepaid, return receipt requested; or one day after it is sent by overnight courier service via UPS or FedEx.

   (b)   *Interpretation.*  You agree that to the extent you become bound by a prior or subsequent written agreement with us setting forth confidentiality, non-solicit, anti-hiring, non-compete and similar covenants in favor of us, such prior or subsequent agreement shall be enforceable independent of this Agreement, and shall not be deemed to modify or supersede this Agreement in any way, or to be modified or superseded by this Agreement in any way. You and we acknowledge that it is our common and mutual intention that, notwithstanding the terms of any such prior or subsequent agreement, this Agreement and each such prior or subsequent agreement shall be enforceable severally, and that you will be bound by and subject to the most restrictive and comprehensive restrictive covenants in any agreement with us to which you are a party. You and we further expressly acknowledge and agree that there are no oral agreements between you and us pertaining to the subject matter hereof.

(c)     *Amendment; No Waiver.* You and we agree that (i) this Agreement may not be amended except in writing signed by both you and us, (ii) the application of any provision of this Agreement may be waived only by a written instrument specifically identifying the provision whose application is being waived and signed by you and us, and (iii) no waiver by either you or us of a breach by the other shall be a waiver of any preceding or succeeding breach, and no waiver by you or us of any right under this Agreement shall be construed as a waiver of any other right.

(d)     *Entire Agreement; Interpretation.* You and we expressly acknowledge and agree that this Agreement constitutes the entire agreement between you and the Company with respect to the subject matter hereof, and there are no oral agreements between you and us pertaining to the subject matter hereof.

(e)     *Your due diligence.* You acknowledge that: (i) you have had a full opportunity to read and understand this Agreement and consult with such attorneys, accountants, business advisors, and other consultants as you deem necessary or advisable; (ii) you have had an opportunity to contribute to the revision of this Agreement as you saw fit; and (iii) this Agreement shall not be construed against one party or the other in the event of any ambiguity.

(f)     *Survival.* The provisions of this Agreement shall survive termination of your employment regardless of the reason, and our assignment thereof to any successor-in-interest or other assignee.

(g)     *Severability.* If any provision of this Agreement or its application is held invalid, such invalidation shall not affect other provisions or applications hereof which can be given effect without the invalid provisions or applications, and so that this objective may be achieved, the provisions hereof are declared to be severable. In the event of a final, non-reviewable, non-appealable determination that any covenant of yours set forth in this Agreement (whether in whole or in part) is void or constitutes an unreasonable restriction against you, such provision shall not be rendered void but shall be deemed to be modified to the minimum extent necessary to make such provision enforceable for the longest duration and the greatest scope as may constitute a reasonable restriction under the circumstances

(h)     *Counterparts.* This Agreement may be executed in multiple originals. Signatures delivered by facsimile or electronic means (including by "pdf") shall be deemed effective for all purposes.

(i)     *Headings.* The Section and subsection headings in this Agreement are for convenience only and shall not affect the meaning of any provision.

\*       \*       \*       \*       \*

This Agreement is executed on the date shown below.

**XPO LOGISTICS, INC.**, a Delaware corporation, for itself and its subsidiaries and affiliates

By: _____

Name:   Gordon E. Devens
Title:   Chief Legal Officer

By: _____
       Employee Signature

_Jessica   Northrop_
Employee Name (Print)

79576
Employee ID

4-4-16
Date



June 13, 2019

djarrell@robinsonbradshaw.com
704.377.8309 : Direct Phone
704.373.3909 : Direct Fax

**VIA EMAIL (jln731@yahoo.com) AND FEDERAL EXPRESS**

Jessica Northrop
8297 Falcon Drive
Liverpool, New York 13090

     Re: Your Obligations to XPO Logistics, Inc. ("XPO")

Dear Ms. Northrop:

     Our firm serves as outside counsel for XPO. We write concerning the obligations you owe to XPO under the Confidential Information Protection Agreement (the "CIPA" or "Agreement") dated April 24, 2016, between you and XPO. A copy of the CIPA is attached to this letter.

     Section 7 of the Agreement prohibits you, for six months following the termination of your employment (which occurred when you resigned effective June 4, 2019), from, among other things, performing any services in the Restricted Territory for a Competing Business in an area, division or segment that competes with XPO. "Competing Business" includes "providers of less-than-truckload, truckload or other motor carrier freight transportation services," "providers of third-party logistics services" such as "freight brokerage, freight forwarding, expediting, internet load boards, last-mile delivery logistics, contract logistics or intermodal providers" or any business that otherwise competes with XPO's business in the Restricted Territory.

     Under Section 6 of the Agreement, you are prohibited from, either directly or indirectly, calling on, contacting, soliciting or otherwise taking away or disrupting XPO's relationship with any customer or carrier on whose account you worked or had regular contact or about whom you obtained any Confidential Information. This restriction applies for a period of two years after the termination of your employment with XPO.

     Our client understands that you may be employed as the Service Center Manager in the Syracuse facility for Saia LTL, a direct competitor of XPO, including in the area of LTL services. That employment would be a direct violation of your obligations in the CIPA. Your solicitation of business from XPO customers or interference with XPO's relationship with its carriers also would constitute a breach of the CIPA.

     You are directed to immediately adhere to the terms of the written promises you made to XPO and to cease and desist from any further violations of the same, including performing services for Saia LTL in violation of the CIPA and calling on or contacting XPO customers or carriers. To that end, we ask that you confirm to us in writing by no later than June 17, 2019 that you have ceased all current violations and that you will comply in full with the obligations to XPO set forth in the CIPA. Please be advised that, should you persist in violating your contract,

XPO intends to enforce your obligations to it by filing suit in Mecklenburg County, North Carolina, as provided by the terms of your CIPA. Should you fail to honor this demand, you will be subject to temporary and permanent injunctive relief, and to any damages, costs or expenses to which XPO is subject and is entitled to receive under North Carolina law.

We also remind you that you are bound to keep XPO's Confidential Information to yourself, and not disclose or use it in any way, as provided in Section 1 of the CIPA. You also must take immediate steps to ensure that you return all electronic and tangible property of XPO, as set forth in Section 2 of the CIPA.

We look forward to hearing from you immediately concerning your full compliance with the CIPA.

Sincerely,

ROBINSON, BRADSHAW & HINSON, P.A.

Douglas M. Jarrell

DMJ/crk

# CONFIDENTIAL INFORMATION PROTECTION AGREEMENT

In this CONFIDENTIAL INFORMATION PROTECTION AGREEMENT (the "*Agreement*"), the terms "*we*," "*us*," "*our*," and "*the Company*" mean, collectively, XPO LOGISTICS, INC., a Delaware corporation, together with its existing and future subsidiaries and controlled affiliates. "*You*," "*your*," "*me*" and "*the Employee*" mean the specific individual whose signature appears on the last page of this Agreement. To help explain the obligations created under this Agreement, we use certain capitalized terms (e.g., "*Confidential Information*," "*Cause*," etc.), which are defined (in alphabetical order) in Section 20, below.

## Background Information

This Agreement is a condition of your employment by the Company or one of its subsidiaries or controlled affiliates. You acknowledge that we are employing you in consideration for your execution and delivery of this Agreement.

We are a third-party transportation, logistics, less-than-truckload and asset-based carrier business. Our customer and carrier lists, pricing strategies, operating processes, methods and procedures, our information technology, our training programs, our business plans, and our other highly confidential or proprietary information are of vital importance to us. We therefore need to be sure that our employees agree to protect the Company regarding these matters, including, for example, our Confidential Information, our intellectual property, returning Company property upon our request, not trying to hire away our employees, not competing with us, not soliciting our customers, not saying bad things about us, and certain other matters as set forth in this Agreement.

## Agreement

In consideration of the Background Information above (which constitutes an important part of this Agreement) and for other good and valuable consideration, the receipt and sufficiency of which are hereby mutually acknowledged, you and the Company agree as follows:

1. *Confidentiality Covenant.* You agree to use our Confidential Information only for our benefit. You agree that other than as required by you to perform your duties for us, you will not, at any time, directly or indirectly use, disclose or copy our Confidential Information (including to personal email or storage media) or assist any other person or entity to do so. You also agree to immediately call to the attention of the Company any facts suggesting that any person or entity is or may be misusing or improperly disclosing Confidential Information.

2. *Return of Company Property When Requested.* You agree to promptly return to us when we request, but in any event by the last day of your employment with us, all of our Confidential Information and all other Company property (tangible or intangible) in your possession or control (e.g., all documents, data, recordings, smartphones, computers and other business equipment, inclusive of all information stored in electronic form), obtained or prepared by or for and utilized by you in the course of your employment, all of which you acknowledge and agree is and shall remain our sole and exclusive property You further agree not to tamper with, alter, delete or destroy any Company property, documents, records, data contained in any location, including but not limited to any information contained on any Company-provided computer or electronic device. system, database, server, portal or network, including but not limited to re-setting electronic devices to their default settings. In addition, you agree not to access or attempt to access any electronic device. system. database, server, portal or network of the Company after your employment ceases

3. *Ownership of Intellectual Property.* Except as otherwise provided by applicable law, you agree that all "*Work Product*" (as that term is defined in Section 20) created in whole or in part by you while employed by us is our exclusive property, and that you will promptly, fully and effectively communicate all Work Product to us. Accordingly, you agree that all Work Product eligible for any form of copyright protection made or contributed to in whole or in part by you within the scope of your employment while so employed shall be deemed a "*work made for hire*" under the copyright laws and shall be owned by us, and that the Company may sell, use, copy, reproduce, display, perform or alter as it sees fit, without any further right or claim by or remuneration to you. To that end, you hereby now (and upon our request, in the future you will) assign, transfer and convey to us, all of your "*Proprietary Rights*" (as that term is defined in Section 20) in all Work Product for our exclusive ownership and use, together with all rights to sue and recover for past and future infringement or misappropriation thereof. In addition, at our request, at all times while you are employed by us and at all times thereafter, you agree to promptly and fully assist us in effecting the foregoing assignment, including but not limited to the further acts of executing any and all documents necessary for us to secure for ourselves such Proprietary Rights in all such Work Product. YOU ARE HEREBY ADVISED, HOWEVER, THAT THE FOREGOING PROVISIONS DO NOT APPLY TO any invention (i) for which none of our equipment, supplies, facilities or Confidential Information were used, <u>and</u> (ii) developed entirely on your own time, unless the invention relates to our businesses or any actual or demonstrably anticipated research or development, or results from any work performed by you for us.

4. *No Conflicting Business Opportunities.* While employed by us, you may acquire knowledge of either (i) information that is relevant to the business of the Company or (ii) knowledge of business opportunities pertaining to the business(es) in which the Company is engaged. In such case, you agree to promptly disclose to the Company such information or business opportunities and agree not to disclose such information to third parties without our express written consent.

5. *Covenant Not to Hire the Company's Employees and Others.* While employed by us and for two (2) years thereafter, you agree not to directly or indirectly hire or interfere (or try to hire or interfere) in any way with (or help any other person or party to (or to try to) hire or in any way to interfere with) our relationship with (i) any of our employees, (ii) any of our independent contractors (iii) any employee of a third party that has an "independent participant" relationship with us and (iv) any person who at any time during the six (6) months prior to such hiring or interference was described by clauses (i), (ii) or (iii) of this paragraph. This undertaking on your part for our benefit is called your "*Anti-Hiring Covenant.*"

6. *Covenant Not to Solicit the Company's Restricted Customers and Carriers.*

(a)  *Agreement Not to Solicit.* While employed by us and for the two (2) years thereafter, you agree that you will not (nor will you assist any other person or entity to), for any reason, either directly or indirectly, call on, contact, solicit or otherwise take away or disrupt, or attempt to call on, contact, solicit or otherwise take away or disrupt, our relationship with or business expectancy from any of our customers or carriers (i) on whose account you worked or with whom you had regular contact, or (ii) as to whom you had access to Confidential Information (in either instance at any time within the last one (1) year of your employment with us). This undertaking on your part for our benefit is called your "*Non-Solicit Covenant.*"

(b)  *You Acknowledge the Legitimacy, Reasonableness and Fairness of Your Non-Solicit Covenant To Us.* You acknowledge that: (i) in the course of performing your duties as an employee who has had and/or will have direct contact with our customers or carriers and/or access to proprietary information about them, you will have access to, and be regularly exposed to, and in some cases will

generate and control, Confidential Information which is sensitive, and competitively valuable information about us; (ii) we have developed our Confidential Information through considerable time, effort and expense; (iii) our relationships with our customers, carriers, vendors, suppliers, business partners and employees, as well our Confidential Information, constitute valuable and legitimate protectable business interests of ours; (iv) your Non-Solicit Covenant is reasonable and necessary to protect those interests, our Confidential Information and our goodwill; and (v) your compliance with your Non-Solicit Covenant following termination of your employment will not prevent you from earning a livelihood in a business similar to our business, but, in any event, your experience and capabilities are such that you now have and will have other opportunities to earn a livelihood and adequate means of support for yourself and your dependents.

7. *Covenant Not to Compete with Us.*

(a) *Duration and Geographic Scope.* While you are employed by us and for a period of six (6) months after your employment ends, whether on account of your resignation or because we terminated your employment with or without Cause, (the "*Restricted Period*"), you are not allowed to compete with us in the "*Restricted Territory*" (geographic area) fixed below. This undertaking on your part for our benefit is called your "*Non-Compete Covenant*."

(b) *Your Non-Compete Covenant to Us.* Subject to the Restricted Period extension and Non-Compete Covenant waiver provisions described below, you expressly agree that both while employed by us and during the Restricted Period, you will not (either directly or indirectly through others) have any of the following business relationships anywhere within your Restricted Territory:

(i) perform any services, whether as an employee, agent or independent contractor, for a "*Competing Business*" (defined below) in an area, division or segment of the Competing Business that competes in any way with any of our businesses;

(ii) own any financial interest in a Competing Business (e.g., as a partner, member, principal, shareholder or other owner (other than a holder of less than 1% of the outstanding voting shares of any publicly held company)); or

(iii) loan money to, borrow money from, lease to, or have any other financial dealings with a Competing Business (except for ownership of less than 1% of the outstanding voting shares of any publicly held company).

(c) *Definition of a "Competing Business".* You and the Company agree that a "*Competing Business*" means any individual or business (e.g., a corporation, partnership or limited liability company) engaged in our business as we are conducting it on the date your employment with us ends (including any business we are then actively considering or were considering at any time during the 12 month period ending on the date of your termination), including by way of example.

(i) any providers of less-than-truckload, truckload, or other motor carrier freight transportation services, including (only by way of example) but not limited to FedEx Freight, UPS, YRC, Roadway, Old Dominion, and Schneider;

(ii) any providers of third-party logistics services, including only by way of illustration, freight brokerage, freight forwarding, expediting, internet load boards, last-mile delivery logistics, contract logistics or intermodal providers, or firms such as CH Robinson, UPS, Coyote Logistics, Expeditors International of Washington, Inc., Echo Global Logistics Inc., Total

Quality Logistics, Roadrunner Transportation Systems, TransCore, Internet Truckstop LLC, syncreon, Neovia Logistics and Hub Group Inc.;

      (iii)    any entity that engages in or may engage in acquisition related or mergers and acquisition activities related to the transportation or third-party logistics industry, including, without limitation, researching, analyzing and evaluating companies for possible investment in or acquisition of, for itself or clients; and

      (iv)    an individual or business that otherwise competes with our business anywhere in the Restricted Territory.

(d)    *Your Restricted Territory.* You agree that your "*Restricted Territory*" means:

      (i)    the territory within one hundred (100) miles from the principal office at which you are employed by us;

      (ii)    the territory within fifty (50) miles from any of our other offices in the United States, Canada and Mexico; and

      (iii)    any state or province in the United States, Canada and Mexico in which our customers are located or we perform services for or on behalf of our customers or carriers.

(e)    *Your Non-Compete Payments if We Terminate You Without Cause.* While the primary consideration for your grant of your Non-Compete Covenant to us is our employment of you, as additional consideration to you for your entering into this Agreement with us, if we terminate your employment *without* Cause (i.e., your employment termination was not on account of your quitting or the Company's terminating your employment for Cause), then we will make "*Non-Compete Payments*" to you, ratably over the six (6) month post-employment Restricted Period in accordance with our normal payroll policies, each in an amount calculated as set forth in subsection (i) below, upon the condition that you first furnish us with a written general release in a form acceptable to us in our sole discretion.

(f)    *Additional Non-Compete Payments and Extension of Your Restricted Period:* We have the right, at our discretion, to extend your Restricted Period for up to eighteen (18) consecutive months in three (3) consecutive six-month extensions, but if we do so, we will make additional payments to you during that time, as described in subsection (j)(i) below ("*Additional Non-Compete Payments*").

(g)    *Our Right to Waive Your Non-Compete Covenant and Avoid Non-Compete Payments:* We recognize that our termination of your employment without Cause may occur at a time when then-relevant specific circumstances surrounding your termination and/or other business considerations cause us to conclude we do not need your Non-Compete Covenant. For that reason, we reserve the right to waive your Non-Compete Covenant, and if we elect to do so, you agree that no Non-Compete Payment will be due or payable to you.

(h)    *Written Notice on Employment Termination – We Let You Know Whether You Are Bound by the Non-Compete Covenant:* If we terminate your employment, it will be by written notice to you and indicating the effective date of your termination, by which we will either advise you (x) of your six (6) month Non-Compete Covenant and the amount of your Non-Compete Payment(s), if any, or (y) alternatively, of our election to waive your Non-Compete Covenant.

(i)   *Amount and Timing of Non-Compete Payments During Six (6) Month Restricted Period.* If we terminate your employment without Cause and do not elect to waive your Non-Compete Covenant, the dollar amount of your monthly Non-Compete Payments will depend on the number of full calendar months you have been employed by us. During the post-employment Restricted Period, the aggregate amount that we will pay you, if applicable, will equal one (1) month of your *"Average Monthly Compensation"* for each full calendar month you were employed by us, up to a maximum of six (6) calendar months but not less than one (1) month. This sum will be paid to you over the six (6) month Restricted Period in accordance with our payroll procedures on our normal pay periods. *"Average Monthly Compensation"* means your average monthly salary and incentive compensation you earned from us during the twelve (12) calendar months immediately preceding your termination date (or shorter period, if you were with us for less than twelve (12) months).

(j)   *Additional Non-Compete Payments For Six (6) Month Extensions of Restricted Period:* If we exercise our rights to extend your Restricted Period beyond its original six (6) month term, we will give you written notice of our first election not less than thirty (30) days before the expiration of the initial six (6) month Restricted Period, and, again at our election, by giving you written notice of our second and/or third extension election(s) not less than thirty (30) days before the expiration of the prior extension(s).

(i)   If we exercise these Restricted Period extension options, we will pay you *"Additional Non-Compete Payments"* for each month of that extension period (prorated for partial months), each in an amount equal to your Average Monthly Compensation, in accordance with our payroll procedures on our normal pay periods.

(ii)   You agree that if we elect to extend the Restricted Period, any money you earn for performing services for anyone else after the first six (6) months of the Restricted Period, whether as an employee or as an independent contractor, will reduce, dollar-for-dollar, the aggregate amount of the Additional Non-Compete Payments we will pay to you. Accordingly, you agree to promptly disclose to us the amount of any such earned income at any time within three (3) years following the date of your termination of employment.

(k)   *You Acknowledge the Legitimacy, Reasonableness and Fairness of Your Non-Compete Covenant To Us.* You acknowledge that: (i) in the course of performing your duties for us you will have access to and will become highly knowledgeable about our Confidential Information; (ii) your Non-Compete Covenant is essential to protect our business and goodwill because were you to enter into activities competitive with our business you would cause us substantial harm (and not only because of your post-employment activities, but because of the impact those activities might have on our other employees and former employees); and (iii) although your compliance with your Non-Compete Covenant may prevent you from earning a livelihood in a business similar to our business, your experience and capabilities are such that you now have and will have other opportunities to earn a livelihood and adequate means of support for yourself and your dependents.

(l)   *Consequences of Your Breach of Your Non-Compete Covenant:* We reserve the right to use any remedies available to us in law or in equity to enforce our rights under this Agreement, generally, and your Anti-Hiring Covenant, Non-Compete Covenant, Non-Solicit Covenant and other covenants to us set forth in this Agreement, specifically However, in addition to any other legal remedies we may be entitled to, you agree that if you breach your Non-Compete Covenant to us, you will repay us all of the Non-Compete Payments we have made to you (net of any taxes paid by you on such payments)

(m)     *Coordination with Other Benefits.* To the extent you are eligible for any other severance or separation benefit ("severance"), you will be entitled to the greater of the severance or the Non-Compete Payments, but not both, and such payment shall be deemed to satisfy our obligations to make the Non-Compete Payments under this Agreement.

8.    *Adherence to Company Policies for the Avoidance of Questionable Transactions.* You agree that while employed by us, you will not enter into any written or verbal agreement or understanding with anyone else, whether a customer, employee, independent contractor or vendor of the Company or otherwise, directly or indirectly providing for the disbursement or receipt of any payments. (a) which involve any illegal purpose, or (b) which involve (i) illegal contributions or other distributions to any other private persons, government officials or employees, political candidates or parties, or (ii) kickbacks or bribes to any person. Further, to the extent within your control, while employed by us you will act to ensure that (i) the documentation of all of our business transactions in which you are involved properly describe the pertinent events, and (ii) the transaction records thereof are not false, distorted or misleading.

9.    *Refraining from Disparaging Us.* While employed by us and thereafter, you agree never to disparage, malign or impugn us or any of our officers, directors and employees.

10. *Cooperating After Employment Ends.* While employed by us and thereafter, you agree to fully cooperate with us in connection with any investigation, suit, action or proceeding in which you may have relevant information or testimony, including but not limited to providing testimony at depositions or trial, which cooperation and appearance you fully agree to without the necessity of a subpoena or court order. If your assistance is required after your employment has ended, we will reimburse you for your reasonable expenses and accommodate your personal and business schedule to the extent practicable.

11. *Giving Notice to a New Employer.* You agree that for a period of two (2) years after the termination of your employment, you will provide any new employer written notice of each of the restrictions to which you are subject under this Agreement (e.g., your Anti-Hiring Covenant, your Non-Solicit Covenant and your Non-Compete Covenant) before you accept an offer of employment and concurrently provide to us a copy of each such written notice.

12. *Prohibited Use of Confidential Information of Your Prior Employers.* It is vital to us that you not disclose to us or use any information or materials that might constitute a former employer's confidential information you obtained while employed by that former employer. Accordingly, you (a) agree not to disclose or use any former employer's confidential information in any form unless you first obtained the prior written consent of that former employer, and (b) represent to us that you searched for and deleted any emails, documents or files prepared, generated, obtained or used by you that contain any such confidential information of a prior employer.

13. *Authority to Enter into this Agreement; No Conflicts.* You represent that you have the right to enter into this Agreement, that doing so is not and does not conflict with or breach any obligations you may have under any agreement you have or any court order, and that your signature on this Agreement makes it our valid and binding obligation, fully enforceable in accordance with its terms.

14. *Prior Restrictive Covenant Agreements to Which You Are Bound.* You represent to us that you. (a) have provided us true, correct and complete copies of any agreement to which you are subject containing non-competition, non-solicitation or similar restrictions or covenants in favor of any prior employer or other party; and (b) are free to enter into this Agreement and be employed by us in accordance with the terms of this Agreement without breaching or violating any such prior agreements

15. *Employee Acknowledgements Regarding Termination for Cause.* You acknowledge that your breach of your representations, covenants and agreements set forth in Sections 1 through 14 hereof is grounds for immediate termination for Cause by us. You agree that if, subsequent to termination of your employment for any reason (but in no event more than six (6) months after the date of termination of your employment), we determine in good faith that we could have terminated your employment for Cause, or we discover a breach of any provision herein, your employment shall, at our election, be deemed to have been terminated for Cause retroactively to the date your employment terminated.

16. *Termination Certificate.* Immediately following your termination of employment for any reason other than on account of your death or total disability, you will promptly return to us all of our property, as required by the provisions of Section 2, and you will concurrently execute and deliver to us a termination certificate, in a form acceptable to us in our sole discretion, regarding matters such as your return of our property and your compliance, both at the time of termination and thereafter, with your obligations under this Agreement.

17. *Employment At-Will.* As explained in your employment offer, you are employed at-will. Nothing in this Agreement changes your at-will employment status or confers any right with respect to continuation of employment, and nothing in this Agreement interferes in any way with the Parties' right to terminate the employment relationship at any time, with or without Cause or advance notice.

18. *Governing Law; Arbitration; Consent to Jurisdiction; and Waiver of Jury Trial.*

(a)     *Governing Law:* This Agreement shall be governed by and construed in accordance with its express terms, and otherwise in accordance with the laws of the State of North Carolina without reference to its principles of conflicts of law

(b)     *Arbitration of Claims Initiated by You:* Any claim you wish to initiate arising out of or relating to this Agreement, the breach thereof, your employment with us, or the termination of that employment will be resolved by binding arbitration before a single arbitrator in the City of Charlotte, North Carolina administered by the American Arbitration Association in accordance with its Labor, Employment & Elections Arbitration Rules, and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

(c)     *Claims by Us Initiated by Us:* Any claim initiated by us arising out of or relating to this Agreement, the breach thereof, your employment or its termination, shall, at our election, be resolved in accordance with Sections 18(b) or 18(d), in our sole discretion.

(d)     *Consent to Jurisdiction and Waiver of Jury Trial:* You hereby irrevocably submit to the jurisdiction of any state or federal court located in Mecklenburg County, North Carolina; provided, however, that nothing herein shall preclude us from bringing any suit, action or proceeding in any other court, including without limitation for the purposes of enforcing the provisions of this Section 18 or enforcing any judgment or award obtained by us. You waive, to the fullest extent permitted by applicable law, any objection you now or hereafter have to personal jurisdiction or to the laying of venue of any such suit, action or proceeding brought in an applicable court described in this Section 18(d), and agree that you will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any court. You further agree that, to the fullest extent permitted by applicable law, a final and non-appealable judgment in any suit, action or proceeding brought in any applicable court described in subsection (d) shall be conclusive and binding upon you and may be enforced in any other jurisdiction. To the extent that, notwithstanding Section 18(b), you bring an action in any court, you agree to do so exclusively in the state or federal court located in Mecklenburg County, North Carolina, provided that

nothing herein shall waive the Company's right to demand that you comply with Section 18(b). YOU EXPRESSLY AND KNOWINGLY WAIVE ANY RIGHT TO A JURY TRIAL IN THE EVENT THAT ANY ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE BREACH THEREOF, OR YOUR EMPLOYMENT, OR THE TERMINATION THEREOF, IS LITIGATED OR HEARD IN ANY COURT.

19. *Remedies; Injunctions for Breaches of this Agreement.* All of Company's rights and remedies may be exercised alternatively or cumulatively to the fullest extent permitted by law. You acknowledge that in addition to the acknowledgements you made in Sections 5, 6 and 7 of this Agreement, you have considered each of the other restrictive covenants set forth in this Agreement and stipulate that those covenants are likewise reasonable and necessary to protect us and our Confidential Information, business strategies, employee and customer relationships and goodwill, now existing or to be developed in the future. You hereby: (i) agree to comply with all of the restrictive covenants, (ii) waive any right to contest the reasonableness, validity, scope or enforceability of any of the restrictive covenants, or any other claim or defense related thereto, (iii) agree that injunctive relief would be the most practical and efficient remedy for us in the event of your breach; and (iv) agree that the Company, without having to post bond or prove a lack of an adequate remedy at law, shall be entitled to injunctive relief against any breach by you of a restrictive covenant, provided that the foregoing shall not prejudice our rights to require you to account for and pay over to us any compensation, profits, gains, or derived by you related to the breach, and you agree to be so responsible for such an accounting. You further agree that if you violate your Anti-Hiring Covenant, your Non-Compete Covenant, and/or your Non-Solicit Covenant set forth in Sections 5, 6 and 7 of this Agreement, respectively, the post-employment restricted time period therein set forth shall be extended by a period of time equal to that period beginning when your activities constituting such violation commenced and ending when such violative activities terminated.

20. *Definitions.* This Agreement uses the following defined terms; they are intended to have the broadest meaning allowed by law to afford us the greatest protection.

"*Cause*" shall mean, in connection with your employment, (1) your dereliction of duties, failure to perform your duties hereunder, or refusal or repeated failure to follow any lawful rules or directive of the Company; (2) abuse of or dependency on alcohol or drugs (illicit or otherwise) that adversely affects your performance of duties for us; (3) commission of any fraud, embezzlement, theft or dishonesty, or any misappropriation of money or other Company assets; (4) breach of your fiduciary duties to us; (5) any act, or failure to act, in bad faith to our detriment; (6) failure to cooperate in good faith with a governmental or internal Company investigation or any of our directors, managers, officers or employees, if your cooperation is requested; (7) conviction of, or plea of *nolo contendere* to, a felony or any serious crime; or (8) your material breach of any representation, warranty or agreement created by this Agreement or any of our policies.

"*Confidential Information*" means all information, written (whether generated or stored on magnetic, digital, photographic or other media) or oral, not generally known, or proprietary to us about our businesses, affairs, operations, products, services, customer and carrier lists, pricing strategies, operating processes, business methods and procedures, information technology and information-gathering techniques and methods, business plans, financial affairs, and all other accumulated data, listings, or similar recorded matter useful in the businesses of the Company, including by way of illustration and not limitation.

- information about the business, affairs or operation of the Company developed by you or which is furnished to you by us during your employment;
- operating instructions, training manuals, procedures, and similar information;

- information about customers, carriers, vendors and other with whom we do business (e.g. customer, carrier or vendor lists, pricing, contracts, and activity records);
- information regarding the skills and compensation of employees or contractors of the Company;
- information about sales and marketing (e.g., plans and strategies);
- information about any other third parties we have a business relationship with or owe a duty of confidentiality; and
- all notes, observations, data, analyses, compilations, forecasts, studies or other documents prepared by you that contain or reflect any Confidential Information and which is not known to the public generally other than as a result of your breach of this Agreement.

However, the Company expressly acknowledges and agrees that the term "Confidential Information" excludes information which (A) is in the public domain or otherwise generally known to the trade, or (B) is disclosed to third parties other than by reason of your breach of your confidentiality obligations under this Agreement or (C) is learned of by you after the termination of your employment from any other party not then under an obligation of confidentiality to us.

"*Proprietary Rights*" means all right, title and interest regarding all inventions, ideas, improvements, designs, processes, trademarks, service marks, trade names, trade secrets, trade dress, data, discoveries, Work Product, and any other proprietary assets or rights.

"*Work Product*" means all works of authorship, research, discoveries, inventions and innovations (whether or not reduced to practice or documented), improvements, developments, methods, designs, analyses, drawings, reports and all similar or related information (whether patentable or un-patentable, and whether or not reduced to writing), trade secrets and Confidential Information, copyrightable works, and similar and related information (in whatever form or medium). As examples, this definition applies to anything to do with the Company's actual or anticipated business, research and development or existing or future products or services. It applies to the results from any work performed by you for us. It also applies to anything conceived, developed, made or contributed to in whole or in part by you while employed by us.

21. *Other Agreements.*

(a) *Notices.* Except as otherwise provided, we can give you notice at your last known principal residence listed on our records. You, in turn, may give us notice to XPO Logistics, Inc., Five Greenwich Office Park, Greenwich, CT 06831, Attention: Chief Legal Officer. Either you or the Company may provide another address for notice by written notice to the other. Notice is deemed given as follows: when delivered personally; four (4) days after it is mailed by registered or certified mail, postage prepaid, return receipt requested; or one day after it is sent by overnight courier service via UPS or FedEx.

(b) *Interpretation.* You agree that to the extent you become bound by a prior or subsequent written agreement with us setting forth confidentiality, non-solicit, anti-hiring, non-compete and similar covenants in favor of us, such prior or subsequent agreement shall be enforceable independent of this Agreement, and shall not be deemed to modify or supersede this Agreement in any way, or to be modified or superseded by this Agreement in any way. You and we acknowledge that it is our common and mutual intention that, notwithstanding the terms of any such prior or subsequent agreement, this Agreement and each such prior or subsequent agreement shall be enforceable severally, and that you will be bound by and subject to the most restrictive and comprehensive restrictive covenants in any agreement with us to which you are a party. You and we further expressly acknowledge and agree that there are no oral agreements between you and us pertaining to the subject matter hereof.

(c) **Amendment; No Waiver.** You and we agree that (i) this Agreement may not be amended except in writing signed by both you and us, (ii) the application of any provision of this Agreement may be waived only by a written instrument specifically identifying the provision whose application is being waived and signed by you and us, and (iii) no waiver by either you or us of a breach by the other shall be a waiver of any preceding or succeeding breach, and no waiver by you or us of any right under this Agreement shall be construed as a waiver of any other right.

(d) **Entire Agreement; Interpretation.** You and we expressly acknowledge and agree that this Agreement constitutes the entire agreement between you and the Company with respect to the subject matter hereof, and there are no oral agreements between you and us pertaining to the subject matter hereof.

(e) **Your due diligence.** You acknowledge that: (i) you have had a full opportunity to read and understand this Agreement and consult with such attorneys, accountants, business advisors, and other consultants as you deem necessary or advisable; (ii) you have had an opportunity to contribute to the revision of this Agreement as you saw fit; and (iii) this Agreement shall not be construed against one party or the other in the event of any ambiguity

(f) **Survival.** The provisions of this Agreement shall survive termination of your employment regardless of the reason, and our assignment thereof to any successor-in-interest or other assignee.

(g) **Severability.** If any provision of this Agreement or its application is held invalid, such invalidation shall not affect other provisions or applications hereof which can be given effect without the invalid provisions or applications, and so that this objective may be achieved, the provisions hereof are declared to be severable. In the event of a final, non-reviewable, non-appealable determination that any covenant of yours set forth in this Agreement (whether in whole or in part) is void or constitutes an unreasonable restriction against you, such provision shall not be rendered void but shall be deemed to be modified to the minimum extent necessary to make such provision enforceable for the longest duration and the greatest scope as may constitute a reasonable restriction under the circumstances

(h) **Counterparts.** This Agreement may be executed in multiple originals. Signatures delivered by facsimile or electronic means (including by "pdf") shall be deemed effective for all purposes.

(i) **Headings.** The Section and subsection headings in this Agreement are for convenience only and shall not affect the meaning of any provision.

This Agreement is executed on the date shown below.

**XPO LOGISTICS, INC.,** a Delaware corporation, for itself and its subsidiaries and affiliates

By: _____

Name:  Gordon E. Devens
Title:    Chief Legal Officer


By: _____
Employee Signature


Jessica Northrop
Employee Name (Print)


79576
Employee ID


4-4-16
Date



ROBINSON

BRADSHAW

July 18, 2019

DJarrell@robinsonbradshaw.com
704.377.8309 : Direct Phone
704.373.3809 : Direct Fax

**VIA HAND DELIVERY**

Mecklenburg Superior Court Judges' Office
Superior Court Judge Presiding, CR 6310, July 22, 2019 at 2:30 pm
832 E. Fourth Street, Suite 9600
Charlotte, NC  28202

Re:     *XPO Logistics, Inc. v. Jessica Northrop*
          (File NO. 19-CVS-12904)

Dear Mecklenburg Superior Court Judges' Office Staff:

Our firm represents Plaintiff XPO Logistics, Inc. in the above-referenced action.  In anticipation
of the Monday, July 22, 2:30 pm hearing on our Motion for Preliminary Injunction, I have
enclosed Plaintiff's Brief in Support of Preliminary Injunction, the Affidavit of James J. Byrne and
the Affidavit of Satyra L. Riggins

If there are any questions, please do not hesitate to contact me.

Best regards.

Sincerely,

ROBINSON, BRADSHAW & HINSON, P.A.

Douglas M. Jarrell

DMJ/slr

cc:     Craig Leis, Esq. via email (craig@gibbonsleis.com) and first-class mail

ROBINSON, BRADSHAW & HINSON, P.A. : robinsonbradshaw.com
Charlotte Office : 101 N. Tryon St., Ste. 1900, Charlotte, NC 28246 : 704.377.2536

| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| COUNTY OF MECKLENBURG | SUPERIOR COURT DIVISION |
| | CIVIL ACTION NO: 19-CVS-12904 |

**STATE OF NORTH CAROLINA**

**COUNTY OF MECKLENBURG**

**XPO LOGISTICS, INC.,**

**Plaintiff,**

**v.**

**JESSICA NORTHROP,**

**Defendant.**

**IN THE GENERAL COURT OF JUSTICE**
**SUPERIOR COURT DIVISION**
**CIVIL ACTION NO: 19-CVS-12904**

**PLAINTIFF'S BRIEF IN SUPPORT OF PRELIMINARY INJUNCTION**

Pursuant to North Carolina Rule of Civil Procedure 65, Plaintiff XPO Logistics, Inc. ("XPO") seeks a preliminary injunction to prevent Defendant Jessica Northrop ("Northrop"), former Service Center Manager for its less-than-truckload ("LTL") facility in East Syracuse, New York (the "Syracuse Facility"), from further violating the noncompetition, confidentiality, and return-of-company property covenants set forth in her employment agreement with Plaintiff. The evidence supporting XPO's need for injunctive relief includes the following:

- As Service Center Manager in XPO's LTL facility in East Syracuse, New York, Northrop managed all aspects of the facility's operations and regularly accessed XPO's Confidential Information.

- On June 3, 2019, while employed at XPO, Northrop accepted a position with Saia LTL Freight—a direct competitor of XPO—serving as the Terminal Manager of Saia's newly opened facility in Syracuse, New York.

- On the same day she accepted the manager position with XPO's competitor—but while still employed by XPO—Northrop secretly and without authorization sent multiple emails from her company email account to her personal email account containing highly sensitive Confidential Information and proprietary materials about XPO's business, including XPO's "Third Quarter Update.pptx" and "Q4Playbook.xlsx."

- Northrop subsequently transferred to another one of Saia's newly opened LTL facilities in Newburgh, New York as "Special Projects Manager," where she would be responsible for addressing operational issues for that facility and other Saia facilities.

On July 1, 2019, Judge Ervin granted XPO's motion for a Temporary Restraining Order enjoining Northrop from violating the noncompetition and confidentiality covenants set forth in her employment agreement. XPO now seeks a preliminary injunction to continue that restraint.

## I.   STATEMENT OF FACTS

### A.   XPO

XPO is a global leader in less-than-truckload ("LTL") transportation and one of North America's largest LTL providers. XPO's LTL coverage extends to every state, encompassing 99% of all U.S. zip codes, and into Mexico, Puerto Rico, and Canada. (*Verified Compl.* ¶ 10.) It operates a transportation network that includes over 75,000 next-day and two-day lanes and offers multimodal transportation and logistics solutions to its customers through the use of data-driven reporting and custom analytics. It operates its LTL transportation through facilities such as the one for which Defendant Northrop served as the Service Center Manager. (*Id.* ¶¶ 12-13.)

### B.   Northrop's Employment with XPO

Since 2009, Northrop has worked in the LTL business for XPO or its predecessor, with access to the company's Confidential Information. (*Id.* ¶ 21.) In April 2016, Northrop accepted a transfer from her position as Service Center Manager in XPO's facility in Syosset, New York to Service Center Manager for the Syracuse Facility. (*Id.*) In connection with this transfer, Northrop entered into the Confidential Information Protection Agreement (the "Agreement"), which is attached as Exhibit 1 to the Verified Complaint. (*Id.*) She also received an annual salary increase of $9,285.12 as consideration for signing the Agreement. (*Id.*) Northrop served as the Service Center Manager of the Syracuse Facility from April 2016 until she resigned in June 2019. (*Id.* ¶¶ 21, 41.)

2

As the Service Center Manager for the Syracuse Facility, Northrop was responsible for the overall management and performance of the facility and its employees. (*Id.* ¶ 22.) Her duties included selling XPO's services to businesses and managing the interactions with those customers; resolving customer concerns; and managing all the facility's employees, costs, maintenance, supplies, manpower planning, and customer claims. (*Id.*) Northrop had overall P&L responsibility for the Syracuse Facility. (*Id.*) She also was charged with implementing new strategies and initiatives, managing programs and process improvements to ensure continued business growth and long-term relationships with customers. (*Byrne Aff.* ¶ 3.) In addition, XPO trains its Service Center Managers to identify opportunities to expand and cross-sell business with customers who may have needs for additional transportation solutions. (*Id.* ¶ 4.)

Through her employment, Northrop became privy to a wide array of XPO's proprietary and confidential information regarding XPO's LTL business and customers, including business strategy, pricing, contracts, employee compensation, proprietary management and operational processes, competitive offerings, technology tools related to routing systems, business intelligence systems, and safety systems; confidential freight movements and procedures; and corporate security procedures. (*Verified Compl.* ¶¶ 24, 25.) These technology tools and information provide XPO with advantages over its competitors in the LTL industry.

In addition, Northrop acquired significant Confidential Information about XPO's LTL business outside of the Syracuse Facility by participating in regularly recurring meetings with other managers and members of XPO's leadership team. (*Id.* ¶¶ 26, 27.) For example, in connection with her weekly meeting with other managers in her district—comprised of twenty facilities across seven states—XPO provided Northrop with a confidential "Business Information Report" with detailed data regarding revenue, tonnage, and yield for all the facilities in her district. (*Id.* ¶ 26.)

3

In her position, Northrop also had access to confidential financial and operational data for every LTL terminal in XPO's East region, which is one of XPO's four LTL regions. (*Id.* ¶ 28.) She also participated in a monthly "manager meeting" at which XPO's executive leadership reviewed the financial performance and goals for XPO's entire LTL business. (*Id.*) Further, she obtained exposure to XPO's pricing and potential business opportunities across XPO's range of transportation solutions. (*Byrne Aff.* ¶ 4.)

### C. Northrop's Employment Agreement

In connection with her employment by XPO, Northrop agreed to the terms of the Agreement, including:

- Section 1, wherein Northrop promised to use XPO's Confidential Information only for XPO's benefit and that, other than as required to fulfill her duties for XPO, she would not, at any time, directly or indirectly use, disclose, or copy XPO's Confidential Information or assist any other person or entity to do so. (*Verified Compl.* ¶ 15; *Id.* Exhibit 1.)

- Section 2, wherein Northrop promised to return all XPO Confidential Information and property, including any documents, data, recordings, smartphones, computers, or other business equipment belonging to XPO, no later than the last day of her employment. (*Id.* ¶ 16, *Id.* Exhibit 1.)

- Section 7, wherein Northrop promised that, while employed by XPO and for a period of six months after termination of her employment, she would not perform services for a Competing Business (like Saia) in an area, division, or segment that competes with XPO.[1] (*Id.* ¶ 19, *Id.* Exhibit 1.)

As used in the Agreement, Confidential Information means information, not generally known, or proprietary to XPO about its business, affairs, operations, products, services, client and carrier lists, pricing strategies, operating processes, business methods and procedures, information technology and information-gathering techniques and methods, business plans, financial affairs

---

[1] "Competing Business," as defined in the Agreement, includes a company, like Saia, that is engaged in the same business as XPO—such as LTL services. (*Id.* ¶ 19, *Id.* Exhibit 1.)

and all other accumulated data.[2]  (*Id.* ¶ 17.)  Because of the intensely competitive nature of the

logistics industry, XPO closely guards this sensitive and proprietary Confidential Information.  (*Id.*

¶ 29.)

### D.    Northrop Secretly and Unlawfully Took XPO's Confidential and Proprietary Information to Help Open a Competing Business's New Facility

On May 29, 2019, while working at XPO's Syracuse Facility, Northrop accepted an offer

to serve as the Terminal Manager for Saia's newly opened terminal in Syracuse.  (*Id.* ¶ 32.)  That

same day, Northrop used her company email account and secretly emailed multiple XPO files

containing proprietary management tools and Confidential Information to her personal email

account.  (*Id.* ¶¶ 1, 33.)  XPO conducted a forensic examination of Northrop's XPO email account

and discovered that on May 29 and 31, 2019, Northrop emailed the following XPO documents to

her personal email address:

> (a) "Third Quarter Update.pptx" (PowerPoint presentation)
>
> (b) "Q4Playbook.xlsx" (Excel spreadsheet)
>
> (c) "Conference Report" form
>
> (d) "SWFL matter.xlsx" (Excel spreadsheet)
>
> (e) "SCM Responsibilities and Expectations.xlsx" (Excel spreadsheet)
>
> (f) "Pre-shift template.xlsx" (Excel spreadsheet)
>
> (g) "Copy of DockXSY.xls" (Excel spreadsheet)
>
> (h) "XSY Employee_Training_Record_Spreadsheet_xlsx" (Excel spreadsheet)

---

[2] By way of illustration, the term "Confidential Information" includes information about clients, carriers, vendors; information about sales and marketing (including plans and strategies); information about other third parties with whom XPO does business; and data, analyses, compilations, forecasts, studies and other documents prepared by Northrop that contain Confidential Information that is not known to the public generally.  (*Id.* ¶ 17.)

(*Id.* ¶¶ 33, 34.)  These documents constituted confidential and proprietary information about XPO's business, including its operations, business strategy, customers, and financial information. (*Id.* ¶ 35.)  For example, the "Third Quarter Update" is a proprietary tool that XPO uses to internally communicate confidential operational and performance information, such as competitively sensitive information about the company's incentive plan for employees. (*Id.* ¶ 36.) Likewise, the "Q4 Playbook" is a proprietary management tool that is designed to identify and execute strategies and actions to drive improvements across all aspects of an LTL facility's business. (*Id.* ¶ 37.)  XPO developed and uses these management tool to provide itself a competitive advantage in the LTL industry. (*Id.*)

Northrop also took other XPO documents and forms that XPO developed to assist its managers in effectively and efficiently managing its LTL facilities' operations and workforce. (*Id.* ¶ 38.) Along with the documents mentioned above, the confidential materials Northrop took from XPO provided her with a ready-made "starter kit" to open up and manage the operations of a new facility, such as one of Saia's newly opened LTL terminals. (*Id.* ¶ 39.)

**E.     Northrop Leaves XPO to Work for a Competing Business**

On June 4, 2019, after Northrop secretly took XPO's Confidential Information and accepted the position as Saia's Terminal Manager in Syracuse, she resigned from XPO. (*Id.* ¶ 41.) By letter dated June 13, 2019, XPO demanded that Northrop comply with her obligations under the Agreement. (*Id.* ¶ 44, *Id.* Exhibit 2.)  Northrop did not respond. (*Id.*)

**F.     The Temporary Restraining Order**

On June 28, 2019, XPO filed a Verified Complaint against Northrop seeking preliminary and permanent injunctive relief as remedies for her breach of contract.  On July 1, 2019, Judge Ervin entered a Temporary Restraining Order enjoining Northrop from:  (i) violating the

noncompetition covenant set forth in the Agreement; (ii) violating the confidentiality covenants contained in the Agreement; and (iii) accessing, disclosing, destroying, removing, transferring, copying, sharing, or altering any documents or tangible things constituting Confidential Information or that belong to XPO, including computer files and other electronic data. The Order also compelled Northrop to provide to XPO within ten days all of her electronic devices, including personal media and storage drives, that currently or previously contained Confidential Information, other documents, or information relating to XPO's business, and to return immediately any Confidential Information to XPO.

### G. Northrop's Continuing Violations of the Agreement and the Temporary Restraining Order

In a call with XPO's counsel after issuance of the Temporary Restraining Order, Northrop stated that Saia changed her position from Terminal Manager for the Syracuse facility to "Special Projects Manager" and had relocated her to its LTL facility in Newburgh, New York. (*Riggins Aff.* ¶ 3.) Northrop confirmed that there was no Terminal Manager at the Newburgh facility. (*Id.* ¶ 5.)

Northrop said that her position as Special Projects Manager would involve assisting the Newburgh facility and other LTL terminals in her district with "operational and office issues" to get the facilities opened and running. (*Id.* ¶ 4.) She agreed that her responsibilities and duties as Saia's Special Projects Manager would be similar to those she had as Service Center Manager for XPO except that her position with Saia would involve newly opened terminals. (*Id.*)

Northrop also admitted emailing XPO's Confidential Information to her personal email account because she thought XPO's materials would be helpful in her new job with Saia. (Riggins Aff. ¶ 7.)

Particularly in light of the confidential materials she took from XPO that relate to XPO's proprietary management and operational processes, Ms. Northrop's role in assisting the operations

at multiple facilities would allow her to use XPO's information to improperly compete with XPO. (Byrne Aff. ¶ 6.) These operational processes and analytics for its LTL facilities provide XPO with a competitive advantage and, because this information is generally applicable to any LTL terminal, it could be used to compete unfairly anywhere within XPO's LTL network. (*Id.* ¶ 7.)

Counsel for Saia subsequently notified XPO that Northrop's employment with Saia terminated on July 2, 2019.

## II.    THIS COURT SHOULD ISSUE A PRELIMINARY INJUNCTION

A preliminary injunction should issue "(1) if a plaintiff is able to show likelihood of success on the merits of its case and (2) if a plaintiff is likely to sustain irreparable loss unless the injunction is issued, or if, in the opinion of the Court, issuance is necessary for the protection of a plaintiff's rights during the course of litigation." *Novacare Orthotics & Prosthetics, East Inc. v. Speelman*, 137 N.C. App. 471, 475, 528 S.E.2d 918, 920-21 (2000) (alteration, emphasis, and internal quotation marks omitted). North Carolina authority holds that in the context of covenants in an employment agreement, "breach is the controlling factor and injunctive relief follows almost as a matter of course.'" *A.E.P. Indus., Inc. v. McClure*, 308 N.C. 393, 406, 302 S.E.2d 754, 762 (1983). Indeed, "damage from the breach is presumed to be irreparable and the remedy at law is considered inadequate." *Id.*

Here, XPO is likely to succeed on the merits because the Agreement is valid and enforceable. *See Okuma Am. Corp. v. Bowers*, 181 N.C. App. 85, 91, 638 S.E.2d 617, 621 (2007) (reversing trial court's determination that covenant was unenforceable as a matter of law where it restricted employment for six months with a competitor in North and South America except in an area "which does not compete"). XPO has carried its burden to show that Northrop breached the Agreement. And, finally, based on her prior breaches of the Agreement—including after this Court

8

entered its TRO—XPO will suffer irreparable harm if Northrop is not enjoined from further opportunities to use XPO's confidential and proprietary information to the detriment of XPO. Accordingly, injunctive relief is necessary to protect XPO's rights.

A.     **XPO is Likely to Succeed on the Merits of its Claim that Northrop Breached Enforceable Provisions of the Agreement**

i.     **The Covenant Not to Compete is Enforceable**

In North Carolina, a noncompetition covenant is valid and enforceable if it is (1) in writing; (2) made a part of the employment contract; (3) based on valuable consideration; (4) reasonable as to time and territory; and (5) not against public policy. *See Milner Airco, Inc. v. Morris*, 111 N.C. App. 866, 869, 433 S.E.2d 811, 813 (1993). Noncompetition covenants that are signed after the employment relationship is established require separate consideration to support the covenant, such as a pay raise or other benefits or advantages to the employee. *Calhoun v. WHA Med. Clinic, PLLC*, 178 N.C. App. 585, 597, 632 S.E.2d 563, 571 (2006). Each of these criteria is met here. Defendant's noncompetition promises are in writing, part of the Agreement made in connection with her employment, and consistent with public policy. North Carolina precedent further establishes that the noncompetition agreement is supported by consideration and is reasonable as to time and territory.

*First*, the Agreement is supported by consideration. In April 2016, in exchange for signing the Agreement, Northrop was promoted to Service Center Manager of the Syracuse Facility and received an annual salary increase of $9,285.12.[3] Without signing the Agreement, Northrop would not have otherwise been entitled to receive these benefits.

---

[3] Northrop previously worked as the Service Center Manager for one of XPO's smaller LTL facilities in Syosset, New York.

*Second*, the Agreement is reasonable as to time and territory. *See Okuma*, 181 N.C. App. at 92, 638 S.E.2d at 622 (addressing nearly identical restrictions). The reasonableness of the time and territory restrictions of a covenant not to compete depends on a variety of overlapping factors, including the area of the restriction, the area where the employee worked and operated, the area in which the employer operated, the nature of the business involved, the nature of the employee's duties, and the employee's knowledge of the business operation. *Hartman v. W.H. Odell & Assocs., Inc.*, 117 N.C. App. 307, 312, 450 S.E.2d 912, 917 (1994), *rev. denied*, 339 N.C. 612, 454 S.E.2d 251 (1995). A court should consider the time and territory restrictions in tandem. *Id.* at 311, 450 S.E.2d at 917; *see also Farr Assocs, Inc.. v. Baskin*, 138 N.C. App. 276, 280, 530 S.E.2d 878, 881 (2000) (a "longer period of time is acceptable where the geographic restriction is relatively small, and *vice versa*").

Here, a "six-month restriction is well within the established parameters for covenants not to compete in this State." *Okuma*, 181 N.C. App. at 89, 638 S.E.2d at 620. The covenant not to compete contains a three-tiered territory restriction and includes anywhere in the United States where XPO performs services. Here, given the short duration of time, the nationwide scope of XPO's LTL network and Northrop's knowledge of Confidential Information—including the proprietary materials she unlawfully took from XPO—that can be used to compete against XPO anywhere in the country, these time and territory restrictions are reasonable under well-established North Carolina law. *(Byrne Aff. ¶¶ 6-8.)* *See, e.g., Okuma*, 181 N.C. App. at 92, 638 S.E.2d at 622; *Market America, Inc. v. Christman-Orth*, 135 N.C. App. 143, 520 S.E.2d 570 (1999) (six-month restriction that covered the United States); *Agdata, LP v. Gupta*, 2008 WL 4811674, at *2 (W.D.N.C. Oct. 31, 2008) (nationwide territory).

10

In addition, the non-compete restriction is limited to performing services an area, division or segment of a Competing Business that competes with XPO. Such a restriction is fully consistent with applicable precedent. *See, e.g., Okuma*, 181 N.C. App. at 92, 638 S.E.2d at 622 (approving restriction from employment with competitor unless "in an area of the competitor's business which does not compete" with former employer). Here, Northrop's roles either as Terminal Manager or Special Projects Manager with Saia would be substantially similar to her position with XPO and would involve direct competition with XPO. Indeed, the proprietary materials she took after accepting a position with Saia demonstrate unequivocally that she intended to do just that.

*Third*, XPO has a legitimate business interest in protecting its Confidential Information, customer relationships, and goodwill. *See XPO Logistics, Inc. v. Anis*, 2016 NCBC 52 at *7 (July 12, 2016) (finding that XPO had a legitimate business interest in protecting its Confidential Information); *see also United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 651, 370 S.E.2d 375, 381 (N.C. 1988) ("[The] protection of customer relationships and good will against misappropriation by departing employees is well recognized as a legitimate protectable interest of the employer.").

### ii. Northrop Has Not Kept Her Promise to Refrain from Competing.

Northrop has indisputably breached the noncompetition provision. Saia and XPO are in direct competition. (Verified Compl. ¶ 8.) As discussed above and as the evidence shows, whether as Terminal Manager in Syracuse or Special Projects Manager in Newburgh, Northrop would be working in an area that competes with XPO. (*Id., Riggins Aff.* ¶ 4; *Byrne Aff.* ¶¶ 6-8). Further, Northrop's unlawful misappropriation of XPO's Confidential Information establishes that she intended to compete with XPO using XPO's own proprietary methods. Indeed, her role as Special Projects Manager would have involved multiple facilities, increasing the harm that she could cause to XPO in that role. (*Byrne Aff.* ¶ 6.) Accordingly, XPO's evidence establishes its likelihood of

success in showing that Northrop's employment with Saia violated her covenant not to compete. *See, e.g., Precision Walls, Inc. v. Servie,* 152 N.C. App. 630, 638, 568 S.E.2d, 267, 273 (2002) (affirming grant of preliminary injunction and observing the defendant's exposure to the plaintiff's business information and the similarity between the defendant's old and new job).

### iii.  Northrop Also Failed to Keep Her Promise to Protect XPO's Confidential Information from Improper Disclosure and Misuse.

Northrop also breached the Agreement by secretly stealing XPO's Confidential Information to benefit Saia. In North Carolina, "[t]he elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." *McKinnon v. CV Indus., Inc.,* 213 N.C. App. 328, 333, 713 S.E. 2d 495, 500 (2011) (citations omitted).

Northrop's Agreement with XPO includes a confidentiality provision, which requires Northrop to use XPO's Confidential Information only for XPO's benefit, and to refrain from, at any time, directly or indirectly using, disclosing, or copying XPO's Confidential Information or assisting any other person or entity in doing so. (*Verified Compl.* ¶ 15.) In addition, the Agreement requires that upon termination of employment, Northrop must promptly return all of XPO's Confidential Information and property, including all information stored in electronic form, to XPO by the last day of her employment. (*Id.* ¶ 16.) ne

As described above, Northrop emailed XPO's Confidential Information and proprietary materials to her personal email account when she accepted a position with a direct competitor. The Confidential Information falls squarely within the prohibitions of the restrictive covenants in the Agreement. By taking without authorization XPO's Confidential Information for the benefit and use by XPO's direct competitor, Saia, and by failing to return XPO's Confidential Information, Northrop breached the confidentiality and return-of-property covenants in her Agreement. *See Edgewater Services, Inc. v. Epic Logistics, Inc.,* 217 N.C. App. 399, 720 S.E.2d 30 (2011)

(affirming trial court's finding that former employee breached non-disclosure clause of employment agreement by taking employer's files).

North Carolina courts routinely provide injunctive relief to former employers in similar situations, enjoining former employees from using or disclosing the former employer's confidential and proprietary information in violation of their employment agreements. *See, e.g.* *Campbell Alliance Group, Inc. v. Dandekar*, 2014 WL 51241 (E.D.N.C. Jan. 7, 2014) (granting injunctive relief to former employer when former employee retained confidential information on an external storage device following termination of his employment and downloaded that information to another computer in violation of non-disclosure and return-of-property covenants); *Ge Betz Inc. v. Conrad*, 2007 WL 7646900 ¶10 (N.C. Super. Apr. 25, 2007) (granting injunctive relief to former employer enjoining former employees' use of confidential and proprietary information in violation of their employment agreements).

**B.     A Preliminary Injunction is Necessary to Protect XPO's Rights as a Matter of Law**

Because XPO has demonstrated that it is likely to succeed on the merits of its claims, North Carolina precedent holds that this Court should enjoin Northrop from violating her noncompetition, confidentiality, and return-of-company property covenants under the Agreement.

> We hold that where the primary ultimate remedy sought is an injunction; where the denial of a preliminary injunction would serve effectively to foreclose adequate relief to plaintiff; where no "legal" (as opposed to equitable) remedy will suffice; and where the decision to grant or deny a preliminary injunction in effect results in a determination on the merits, plaintiff has made a showing that the issuance of a preliminary injunction is necessary for the protection of its rights during the course of litigation.

*A.E.P. Indus.*, 308 N.C. at 410, 302 S.E.2d at 764.

Here, a preliminary injunction is the only meaningful remedy available to XPO. The significance of this injunctive relief is heightened substantially by Northrop's repeated breaches

of the Agreement. And based on Northrop's prior violations of the Agreement, an injunction prohibiting Northrop from using or disclosing XPO's Confidential Information, or assisting any person in doing so, and enforcing Northrop's noncompetition, confidentiality, and return-of-company property covenants is the only effective way to preserve and enforce XPO's rights. *Ge Betz Inc.*, 2007 WL 7646900 ¶ 24 (granting injunctive relief to former employer against former employee). In the face of substantial evidence of Northrop's breaches of the Agreement, Northrop should be preliminarily enjoined.

## III. CONCLUSION

Unless enjoined, Defendant's actions will cause irreparable harm to XPO and will cause injuries that cannot be adequately compensated by monetary damages. The injury to XPO is immediate and pressing, and injunctive relief is necessary to preserve the status quo, to protect XPO's rights, and to prevent injury to XPO pending trial. Therefore, the Court should grant XPO's Motion for Preliminary Injunction and issue an order that:

(i) prohibits Northrop, for a period of six (6) months (together with such additional period resulting from enforcement of contractual or equitable tolling principles), from violating the noncompetition provision in her Agreement;

(ii) prohibits Northrop from using or disclosing XPO's Confidential Information or assisting any other person in doing so;

(iii) prohibits Northrop from accessing, disclosing, destroying, removing, transferring, copying, sharing, or altering any documents or tangible things that constitute Confidential Information or that belong to XPO, including without limitation computer files and other electronic data;

(iv) compels Northrop to immediately return any Confidential Information to XPO;

(v) pursuant to Rule 65(d), binds Northrop, her officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice in any manner of this Order by personal service or otherwise; and

(vi) awards XPO such other and further relief as appropriate.

This 18th day of July 2019.

David C. Wright, III
N.C. Bar No. 11161
dwright@robinsonbradshaw.com

Douglas M. Jarrell
N.C. Bar No. 21138
djarrell@robinsonbradshaw.com

Gabriel Wright
N.C. Bar No. 52472
gwright@robinsonbradshaw.com

**Robinson, Bradshaw & Hinson, P.A.**
101 North Tryon Street, Suite 1900
Charlotte, North Carolina 28246-1900
Telephone: (704) 377-2536
Facsimile: (704) 378-4000

*Attorneys for Plaintiff*

## LOCAL RULE 12.13 CERTIFICATION

I certify that this brief complies with Local Rule 12.12.

This 18th day of July, 2019.

_____
Douglas M. Jarrell

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing has been served upon all counsel of record by email and first-class mail, postage prepaid as follows:

> Craig L. Leis (craig@gibbonsleis.com)
> Gibbons Leis PLLC
> 14045 Ballantyne Corporate Place, Suite 325
> Charlotte, NC 28277

This 18th day of July, 2019.

Douglas M. Jarrell

| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
|---|---|
| | SUPERIOR COURT DIVISION |
| COUNTY OF MECKLENBURG | CIVIL ACTION NO: 19-CVS-12904 |

XPO LOGISTICS, INC.,

              **Plaintiff,**

      **v.**

              **AFFIDAVIT OF JAMES J. BYRNE**

JESSICA NORTHROP,

              **Defendant.**

---

James J. Byrne, being first duly sworn, deposed and says:

1. I am an adult citizen and resident of New Hampshire, and I make this Affidavit in support of the Motion for Preliminary Injunction filed by XPO Logistics, Inc. ("XPO"). The statements I have made in this affidavit are based on my own knowledge and information set forth in public sources.

2. I am employed by XPO as District Network Senior Manager. My job responsibilities in this position include overseeing the financial, budgeting, sales and operational aspects of XPO's LTL business for the district known as the "Boston district." This district covers seven states. The Syracuse, New York facility that Ms. Northrop previously managed for XPO was located within the Boston district.

3. As described in XPO's Verified Complaint, in her role as Service Center Manager, Ms. Northrop was responsible for the operational and financial performance of the Syracuse facility. These responsibilities included implementing new strategies and initiatives, managing programs and process improvements to ensure continued business growth and long-term relationships with customers and accountability for overall facility performance.

4. XPO also trains its Service Center Managers to identify opportunities to expand business with customers who may have needs for additional transportation solutions, such as brokerage, "expedite" or "last mile." XPO's Facility Managers are responsible for promoting XPO's business strategy of providing customers with integrated transportation and logistics services according to their needs. Accordingly, by virtue of her role as Facility Manager, Ms. Northrop had exposure to XPO's pricing and potential business opportunities across XPO's range of transportation and logistics solutions.

5. After filing this action, XPO learned that Saia LTL, XPO's direct competitor, had changed Ms. Northrop's position from Terminal Manager at its new Syracuse, New York terminal to "Special Projects Manager" at its newly-opened Newburgh, New York facility. I understand that the Newburgh facility is Saia's headquarters for the district.

6. I also understand that Ms. Northrop advised XPO's counsel that her duties in the "Projects Manager" role would be to address "operational issues" at the Newburgh facility and other Saia facilities. Particularly in light of the confidential materials she took from XPO involving XPO's proprietary management and operational processes, Ms. Northrop's role in assisting the operations at multiple facilities would allow her to utilize XPO's information to improperly compete with XPO. XPO's management and operational processes and analytics for its LTL facilities provide it with a competitive advantage and using such information would provide a competitor with an unfair benefit.

7. Saia's Newburgh facility, like its Syracuse facility, is in the same district as XPO's Syracuse facility and competes directly with XPO for business. As described in XPO's Verified Complaint, Ms. Northrop's access to XPO's Confidential Information—including the type of information she unlawfully took from XPO after accepting her job at Saia—relating to other

2

facilities in her district as well as XPO's entire LTL business would provide a competitor such as Saia with an with an unfair advantage. Because this information is applicable to any LTL terminal, it can be used anywhere an LTL facility is competing within XPO's LTL network.

This 17th day of July, 2019.

James J. Byrne

Sworn to and subscribed
before me, this 17th day of
July, 2019.

_____
Notary Public

My commission expires:

_____
(Official Seal)

THERESA L. PROCTOR
Notary Public, State of New York
No. 01PR6345779
Qualified in Oswego County
Commission Expires August 1, 2020

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing has been served upon all counsel of record by email and first-class mail, postage prepaid as follows:

Craig L. Leis (craig@gibbonsleis.com)
Gibbons Leis PLLC
14045 Ballantyne Corporate Place, Suite 325
Charlotte, NC 28277

This 18th day of July, 2019.

Douglas M. Jarrell

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
CIVIL ACTION NO: 19-CVS-12904

XPO LOGISTICS, INC.,

Plaintiff,

v.

JESSICA NORTHROP,

Defendant.

AFFIDAVIT OF SATYRA L. RIGGINS

Satyra L. Riggins, being first duly sworn, deposed and says:

1.      I am a litigation paralegal with Robinson, Bradshaw & Hinson, P.A. ("Robinson Bradshaw"), who serves as legal counsel to Plaintiff XPO Logistics, Inc. ("XPO") in this matter. The facts stated herein are from my personal knowledge.

2.      I participated in a conference call with Defendant Jessica Northrop ("Ms. Northrop") and Robinson Bradshaw attorneys, Douglas M. Jarrell and Gabriel Wright, on Tuesday, July 2, 2019. The conference call started at approximately 11:15 a.m. and ended at 11:45 a.m. Ms. Northrop was aware that I was participating in the conference call.

3.      Ms. Northrop stated that, at some point after she received Robinson Bradshaw's June 13, 2019 cease and desist letter, Saia changed her position from Terminal Manager for Saia's facility in Syracuse, New York to "Special Projects Manager" at its facility in Newburgh, New York.   She explained that the other facilities in the district are Syracuse, Springfield, Massachusetts and West Boston, Massachusetts. All of these terminals were recently opened by Saia.

4.      Ms. Northrop stated that her position as Special Projects Manager will involve assisting these new LTL terminals with "operational and office issues" in order to help get them

up and running. She agreed that her responsibilities would be similar to her duties as Services Center Manager for XPO, except that her position with Saia would involve newly-opened terminals. As she understood it, her position would require her to help facilities address operational problems as they arose.

5       Ms. Northrop also stated that there was no Terminal Manager at the Newburgh facility.

6.       Ms. Northrop acknowledged that she emailed the XPO files to her personal account because she thought they would be helpful in her new job. She claimed they were corrupt and that she was unable to open them.

This 18th day of July, 2019.

Satyra L. Riggins

Sworn to and subscribed
before me, this 18th day of
July, 2019.

Notary Public      Phyllis Ann Bess

My commission expires:

10/21/2019

(Official Seal)

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing has been served upon all counsel of record by email and first-class mail, postage prepaid as follows:

> Craig L. Leis (craig@gibbonsleis.com)
> Gibbons Leis PLLC
> 14045 Ballantyne Corporate Place, Suite 325
> Charlotte, NC 28277

This 18th day of July, 2019.

Douglas M. Jarrell

3

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

XPO LOGISTICS, INC.,

Plaintiff,

v.

JESSICA NORTHROP,

Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
CIVIL ACTION NO: 19-CVS-12904

AFFIDAVIT FOR SERVICE OF
VERIFIED COMPLAINT AND MOTION
FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY
INJUNCTION AND TEMPORARY
RESTRAINING ORDER ON
DEFENDANT JESSICA NORTHROP

Douglas M. Jarrell, being first duly sworn, deposed and says:

1.      I am an attorney for the Plaintiff XPO Logistics, Inc.

2.      Copies of the Verified Complaint and Motion for Temporary Restraining Order and Preliminary Injunction, Civil Summons, and Civil Action coversheet were deposited with Federal Express, a designated delivery service pursuant to 26 U.S.C. § 7502(f)(2), in accordance with Rule 4(j)(1)(d) of the North Carolina Rules of Civil Procedure.

3.      The Verified Complaint and Motion for Temporary Restraining Order and Preliminary Injunction, Civil Summons and Civil Action coversheet were received by J. Northrop on July 9, 2019, as evidenced by the delivery receipt which is attached hereto as *Exhibit 1.*

4.      Copies of the Temporary Restraining Order were deposited with Federal Express, a designated delivery service pursuant to 26 U.S.C. § 7502(f)(2), in accordance with Rule 5(a) of the North Carolina Rules of Civil Procedure.

5.      The Temporary Restraining Order was received by J. Northrop on July 9, 2019, as evidenced by the delivery receipt which is attached hereto as *Exhibit 2.*

6. This Affidavit is made in accordance with Rule 4(j2)(2) of the North Carolina Rules of Civil Procedure.

This _____ 10ᵗʰ _____ day of July, 2019.

David C. Wright, III
N.C. Bar No. 11161
dwright@robinsonbradshaw.com

Douglas M. Jarrell
N.C. Bar No. 21138
djarrell@robinsonbradshaw.com

Gabriel Wright
N.C. Bar No. 52472
gwright@robinsonbradshaw.com

**Robinson, Bradshaw & Hinson, P.A.**
101 North Tryon Street, Suite 1900
Charlotte, North Carolina 28246-1900
Telephone: 704-377-2536
Facsimile: 704-378-4000

*Attorneys for Plaintiff*

Sworn to and subscribed before me, this 10ᵗʰ day of July, 2019.

Notary Public

My commission expires: December 28, 2022

(Official Seal)

J. ELISE DEAL
NOTARY PUBLIC
MECKLENBURG COUNTY, N.C.

2

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing has been served upon each of the parties to this action by first-class mail, as follows:

> Craig L. Leis
> Gibbons Leis PLLC
> 14045 Ballantyne Corporate Place, Suite 325
> Charlotte, NC 28277

This _10_ day of July, 2019.

Douglas M. Jarrell





July 10, 2019

Dear Customer:

The following is the proof-of-delivery for tracking number **775597651630**.

---

## Delivery Information:

| | | | |
|---|---|---|---|
| **Status:** | Delivered | **Delivered to:** | Residence |
| **Signed for by:** | J.NORTHROP | **Delivery location:** | 8297 FALCON DRIVE |
| | | | LIVERPOOL, NY 13090 |
| **Service type:** | FedEx Priority Overnight | **Delivery date:** | Jul 9, 2019 14:34 |
| **Special Handling:** | Deliver Weekday | | |
| | Residential Delivery | | |
| | Adult Signature Required | | |



---

## Shipping Information:

| | | | |
|---|---|---|---|
| **Tracking number:** | 775597651630 | **Ship date:** | Jun 28, 2019 |
| | | **Weight:** | 1.0 lbs/0.5 kg |

| | |
|---|---|
| **Recipient:** | **Shipper:** |
| Jessica Northrop | Satyra L. Riggins, CLA |
| 8297 Falcon Drive | Robinson Bradshaw and Hinson |
| LIVERPOOL, NY 13090 US | 101 North Tryon Street, Suite 1900 |
| | Charlotte, NC 28246 US |
| **Reference** | 12973.01053 |

Thank you for choosing FedEx.





**EXHIBIT 2**

July 9, 2019

Dear Customer:

The following is the proof-of-delivery for tracking number **775610302874.**

| Delivery Information: | | | |
|---|---|---|---|
| Status: | Delivered | Delivered to: | Residence |
| Signed for by: | J.NORTHROP | Delivery location: | 8297 FALCON DRIVE LIVERPOOL, NY 13090 |
| Service type: | FedEx Priority Overnight | Delivery date: | Jul 9, 2019 14:34 |
| Special Handling: | Saturday Delivery | | |
| | Residential Delivery | | |
| | Adult Signature Required | | |



| Shipping Information: | | | |
|---|---|---|---|
| Tracking number: | 775610302874 | Ship date: | Jul 1, 2019 |
| | | Weight: | 3.0 lbs/1.4 kg |

Recipient:
Jessica Northrop
8297 Falcon Drive
LIVERPOOL, NY 13090 US

Shipper:
Satyra L. Riggins, CLA
Robinson Bradshaw and Hinson
101 North Tryon Street, Suite 1900
Charlotte, NC 28246 US

Reference                          12973.01053

Thank you for choosing FedEx.



STATE OF NORTH CAROLINA     IN THE GENERAL COURT OF JUSTICE
    SUPERIOR COURT DIVISION
COUNTY OF MECKLENBURG     CIVIL ACTION NO: 19-CVS-12904

XPO LOGISTICS, INC.,

    Plaintiff,

    v.    CONSENT ORDER CONTINUING
    TEMPORARY RESTRAINING ORDER
JESSICA NORTHROP,

    Defendant.

On July 1, 2019, this Court entered a temporary restraining order in this case. Pursuant to N.C.R. Civ. Pro. 65(b) and with the consent of Defendant, as evidenced below, the temporary restraining order shall be and it hereby is extended, on the terms below, through the rescheduled date of the preliminary injunction hearing, subject to further order of the Court.

**WHEREFORE, IT IS HEREBY ORDERED** that:

(i)    Defendant is enjoined and restrained from violating the non-competition covenant set forth in the Confidential Information Protection Agreement (the "Agreement") attached as Exhibit 1 to XPO's Verified Complaint and Motion for Temporary Restraining Order and Preliminary Injunction by performing services for a Competing Business, including Saia Motor Freight Line, LLC (Saia LTL Freight), in an area, division or segment that competes with XPO;

(ii)    Defendant is enjoined and restrained from violating the confidentiality covenants set forth in the Agreement, including from using or disclosing XPO's Confidential Information or assisting any other person in doing so;

(iii)    Defendant is enjoined and restrained from accessing, disclosing, destroying, removing, transferring, copying, sharing or altering any documents or tangible things that

constitute Confidential Information or that belong to XPO, including without limitation computer files and other electronic data;

(iv)    Defendant is compelled to provide to XPO or its designated agent any electronic devices in her possession, custody or control, including without limitation any personal media or storage drives, that currently or previously contained Confidential Information or other documents or information relating to XPO's business for inspection and imaging by XPO;

(v)    Defendant is compelled to return immediately any Confidential Information to XPO; and

(vi)    The hearing on XPO's motion for a preliminary injunction is scheduled for 2:30 p.m. on July 22, 2019 in Courtroom 6310 of the Mecklenburg County Courthouse; and

(vii)    This Order shall remain in effect until the hearing on the motion for a preliminary injunction, unless extended before that time.


SO ORDERED, on July 1ₜₕ, 2019.

_____
Superior Court Judge Presiding


CONSENTED TO:
By: _____
Counsel for Defendant

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
CIVIL ACTION NO: 19-CVS-12904

XPO LOGISTICS, INC.,

Plaintiff,

v.

JESSICA NORTHROP,

Defendant.

AMENDED NOTICE OF HEARING ON
MOTION FOR PRELIMINARY
INJUNCTION

PLEASE TAKE NOTICE that Plaintiff's Motion for Preliminary Injunction has been

continued and will now be heard in Mecklenburg County Superior Court, 832 E. Fourth Street,

Courtroom 6310, Charlotte, NC 28202 on Monday, July 22, 2019 at 2:30 pm.

This _____10_____ day of July, 2019.

David C. Wright, III
N.C. Bar No. 11161
dwright@robinsonbradshaw.com

Douglas M. Jarrell
N.C. Bar No. 21138
djarrell@robinsonbradshaw.com

Gabriel Wright
N.C. Bar No. 52472
gwright@robinsonbradshaw.com

**Robinson, Bradshaw & Hinson, P.A.**
101 North Tryon Street, Suite 1900
Charlotte, North Carolina 28246-1900
Telephone: 704-377-2536
Facsimile: 704-378-4000

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing has been served upon each of the parties to this action by first-class mail, as follows:

Craig L. Leis
Gibbons Leis PLLC
14045 Ballantyne Corporate Place, Suite 325
Charlotte, NC 28277

This 11ᵗʰ day of July, 2019.

Douglas M. Jarrell