# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## Civil Action No.: 3:19-cv-00348-FDW-DSC

| | |
|---|---|
| XPO LOGISTICS, INC., <br><br> Plaintiff, <br><br> v. <br><br> JESSICA NORTHROP, <br><br> Defendant. | **PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

Pursuant to Federal Rule of Civil Procedure 65, Plaintiff XPO Logistics, Inc. ("XPO") seeks a preliminary injunction to prevent Defendant Jessica Northrop ("Northrop"), former Service Center Manager for its less-than-truckload ("LTL") facility in East Syracuse, New York (the "Syracuse Facility"), from further violating the noncompetition, confidentiality, and return-of-company property covenants set forth in her employment agreement with Plaintiff. The evidence supporting XPO's need for injunctive relief includes the following:

- As Service Center Manager in XPO's LTL facility in East Syracuse, New York, Northrop managed all aspects of the facility's operations and regularly accessed XPO's Confidential Information.

- On May 29, 2019, while employed at XPO, Northrop accepted a position with Saia LTL Freight—a direct competitor of XPO—serving as the Terminal Manager of Saia's newly opened facility in Syracuse, New York.

- On the same day she accepted the manager position with XPO's competitor—but while still employed by XPO—Northrop secretly and without authorization sent multiple emails from her company email account to her personal email account containing highly sensitive Confidential Information and proprietary materials about XPO's business, including XPO's "Third Quarter Update.pptx" and "Q4Playbook.xlsx."

- Northrop subsequently transferred to another one of Saia's newly opened LTL facilities in Newburgh, New York as "Special Projects Manager," where she would be responsible for addressing operational issues for that facility and other Saia facilities.

On July 1, 2019, the State Court granted XPO's motion for a Temporary Restraining Order enjoining Northrop from violating the noncompetition and confidentiality covenants set forth in her employment agreement. Northrop removed this action to this Court on July 19, 2019. XPO now seeks a preliminary injunction to continue the State Court's restraint.

## I. STATEMENT OF FACTS

### A. XPO

XPO is a global leader in LTL transportation and one of North America's largest LTL providers. XPO's LTL coverage extends to every state, encompassing 99% of all U.S. zip codes, and into Mexico, Puerto Rico, and Canada. (*Verified Compl*. ¶ 10 [Dock. #1-1].) It operates a transportation network that includes over 75,000 next-day and two-day lanes and offers multimodal transportation and logistics solutions to its customers through the use of data-driven reporting and custom analytics. It operates its LTL transportation through facilities such as the one for which Defendant Northrop served as the Service Center Manager. (*Id.* ¶¶ 12-13.)

### B. Northrop's Employment with XPO

Since 2009, Northrop has worked in the LTL business for XPO or its predecessor, with access to the company's Confidential Information. (*Id.* ¶ 21.) In connection with a promotion in April 2016, Northrop entered into the Confidential Information Protection Agreement (the "Agreement"), which is attached as Exhibit 1 to the Verified Complaint. (*Id.*) She also received an annual salary increase of $9,285.12 as consideration for signing the Agreement. (*Id.*) Northrop

served as the Service Center Manager of the Syracuse Facility from April 2016 until she resigned in June 2019.  (*Id.* ¶¶ 21, 41.)

As the Service Center Manager for the Syracuse Facility, Northrop was responsible for the overall management and performance of the facility and its employees.  (*Id.* ¶ 22.)  Her duties included selling XPO's services to businesses and managing the interactions with those customers; resolving customer concerns; and managing all the facility's employees, costs, maintenance, supplies, manpower planning, and customer claims.  (*Id.*)  She also was charged with implementing new strategies and initiatives, managing programs and process improvements to ensure continued business growth and long-term relationships with customers.  (*Byrne Aff.* ¶ 3.)  In addition, XPO trains its Service Center Managers to identify opportunities to expand and cross-sell business with customers who may have needs for additional transportation solutions.  (*Id.* ¶ 4.)

Through her employment, Northrop became privy to a wide array of XPO's proprietary and confidential information regarding XPO's LTL business and customers, including business strategy, pricing, contracts, employee compensation, proprietary management and operational processes, competitive offerings, technology tools related to routing systems, business intelligence systems, and safety systems; confidential freight movements and procedures; and corporate security procedures.  (*Verified Compl.* ¶¶ 24, 25 [Dock. #1-1].)

In addition, Northrop acquired significant Confidential Information about XPO's LTL business outside of the Syracuse Facility by participating in regularly recurring meetings with other managers and members of XPO's leadership team.  (*Id.* ¶¶ 26, 27.) In her position, Northrop also had access to confidential financial and operational data for every LTL terminal in XPO's East region, which is one of XPO's four LTL regions.  (*Id.* ¶ 28.)  She also participated in a monthly

"manager meeting" at which XPO's executive leadership reviewed the financial performance and goals for XPO's nationwide LTL business. (*Id.*) Further, she obtained exposure to XPO's pricing and potential business opportunities across XPO's range of transportation solutions. (*Byrne Aff.* ¶ 4.)

### C. Northrop's Employment Agreement

In connection with her employment by XPO, Northrop agreed to the terms of the Agreement, including:

- Section 1, wherein Northrop promised to use XPO's Confidential Information only for XPO's benefit and that, other than as required to fulfill her duties for XPO, she would not, at any time, directly or indirectly use, disclose, or copy XPO's Confidential Information or assist any other person or entity to do so. (*Verified Compl.* ¶ 15; *Id.* Exhibit 1 [Dock. #1-1].)
- Section 2, wherein Northrop promised to return all XPO Confidential Information and property, including any documents, data, recordings, smartphones, computers, or other business equipment belonging to XPO, no later than the last day of her employment. (*Id.* ¶ 16, *Id.* Exhibit 1.)
- Section 7, wherein Northrop promised that, while employed by XPO and for a period of six months after termination of her employment, she would not perform services for a Competing Business (like Saia) in an area, division, or segment that competes with XPO. (*Id.* ¶ 19, *Id.* Exhibit 1.)

As used in the Agreement, Confidential Information means information, not generally known, or proprietary to XPO about its business, affairs, operations, products, services, client and carrier lists, pricing strategies, operating processes, business methods and procedures, information technology and information-gathering techniques and methods, business plans, financial affairs and all other accumulated data. (*Id.* ¶ 17.) Because of the intensely competitive nature of the logistics industry, XPO closely guards this sensitive and proprietary Confidential Information. (*Id.* ¶ 29.)

### D. Northrop Secretly and Unlawfully Took XPO's Confidential and Proprietary Information to Help Open a Competing Business's New Facility

On May 29, 2019, while working at XPO's Syracuse Facility, Northrop accepted an offer to serve as the Terminal Manager for Saia's newly opened terminal in Syracuse. (*Id.* ¶ 32According to its public filings, Saia recently initiated a strategy to begin serving new markets in the Northeast by opening new terminals in that region. (*Id.*)

The same day she accepted the offer from Saia—and while still employed at XPO—Northrop used her company email account and secretly emailed multiple XPO files containing proprietary management tools and Confidential Information to her personal email account. (*Id.* ¶¶ 1, 33.) XPO conducted a forensic examination of Northrop's XPO email account and discovered that on May 29 and 31, 2019, Northrop forwarded numerous XPO documents to her personal email address, including the following:

>   (a) "Third Quarter Update.pptx" (PowerPoint presentation)
>
>   (b) "Q4Playbook.xlsx" (Excel spreadsheet)
>
>   (c) "Conference Report" form
>
>   (d) "SWFL matter.xlsx" (Excel spreadsheet)
>
>   (e) "SCM Responsibilities and Expectations.xlsx" (Excel spreadsheet)
>
>   (f) "Pre-shift template.xlsx" (Excel spreadsheet)
>
>   (g) "Copy of DockXSY.xls" (Excel spreadsheet)
>
>   (h) "XSY Employee_Training_Record_Spreadsheet_xlsx" (Excel spreadsheet)

(*Id.* ¶¶ 33, 34.) These documents constituted confidential and proprietary information about XPO's business, including its operations, business strategy, customers, and financial information. (*Id.* ¶ 35.) For example, the "Third Quarter Update" is a proprietary tool that XPO uses to internally communicate confidential operational and performance information, such as competitively sensitive information about the company's incentive plan for employees. (*Id.* ¶ 36.)

Likewise, the "Q4 Playbook" is a proprietary management tool that is designed to identify and execute strategies and actions to drive improvements across all aspects of an LTL facility's business. (*Id.* ¶ 37.) XPO developed and uses these management tools to provide itself a competitive advantage in the LTL industry. (*Id.*)

Along with the documents mentioned above, the multiple confidential materials Northrop took from XPO provided her with a ready-made "starter kit" to open up and manage the operations of a new facility, such as one of Saia's newly opened LTL terminals. (*Id.* ¶ 39.)[1]

### E. Northrop Leaves XPO to Work for a Competing Business

On June 3, 2019, after Northrop secretly stole XPO's Confidential Information and accepted the position as Saia's Terminal Manager in Syracuse, she resigned from XPO. (*Id.* ¶ 41.) By letter dated June 13, 2019, XPO demanded that Northrop comply with her obligations under the Agreement. (*Id.* ¶ 44, *Id.* Exhibit 2.) Northrop did not respond. (*Id.*)

### F. The Temporary Restraining Order

On June 28, 2019, XPO filed a Verified Complaint against Northrop in State Court seeking preliminary and permanent injunctive relief as remedies for her breach of contract and provided notice by email of the hearing on the motion for a temporary restraining order set for July 1, 2019. [Dock. #1-1] On July 1, 2019, the State Court entered a Temporary Restraining Order enjoining Northrop from violating the obligations in the Agreement and compelling her to provide her electronic devices for inspection. XPO has engaged a forensic inspector to inspect Northrop's iPad, phone and personal email account. That inspection process is ongoing. Pursuant to an

---

[1] The forensic examination is ongoing. The above are only examples of the XPO emails and files that Northrop sent to her personal email on or after the date she accepted employment with Saia.

inspection protocol agreed to by counsel, the inspector ultimately will remove XPO's proprietary files located in her personal yahoo email account and will retain an image for evidentiary purposes.

### G. Northrop's Continuing Violations of the TRO as "Special Projects Manager"

According to Northrop, Saia changed her position from Terminal Manager for the Syracuse facility to "Special Projects Manager" and relocated her to its LTL facility in Newburgh, New York. (*Riggins Aff.* ¶ 3.) Northrop confirmed that there was no Terminal Manager at the Newburgh facility. (*Id.* ¶ 5.)

Northrop said that her position as Special Projects Manager would involve assisting the Newburgh facility and other LTL terminals in her district with "operational and office issues" to get the facilities opened and running. (*Id.* ¶ 4.) She agreed that her responsibilities and duties as Saia's Special Projects Manager would be similar to those she had as Service Center Manager for XPO except that her position with Saia would involve newly opened terminals. (*Id.*)

Northrop also admitted emailing XPO's Confidential Information to her personal email account because she thought XPO's materials would be helpful in her new job with Saia. (*Id.* ¶ 7.)

Particularly in light of the confidential materials she took from XPO that relate to XPO's proprietary management and operational processes, Ms. Northrop's role in assisting the operations at multiple facilities would allow her to use XPO's information to improperly compete with XPO. (*Byrne Aff*. ¶ 6.) These operational processes and analytics for its LTL facilities provide XPO with a competitive advantage and, because this information is generally applicable to any LTL terminal, it could be used to compete unfairly anywhere within XPO's LTL network. (*Id.* ¶ 7.)

After the TRO was entered, counsel for Saia subsequently notified XPO that Northrop's employment with Saia terminated on July 2, 2019. Significantly, Northrop has not indicated that,

absent an injunction from the Court, she intends to comply with her noncompetition obligations. Her prior actions demonstrate clearly that she does not.

## II. THIS COURT SHOULD ISSUE A PRELIMINARY INJUNCTION

In order to obtain a preliminary injunction, XPO must establish that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 374 (2008). As set forth below, all of these factors weigh in favor of the issuance of a preliminary injunction to enforce Northrop's contractual obligations and protect XPO's rights.

### A. XPO is Likely to Succeed on the Merits of its Claim that Northrop Breached Enforceable Provisions of the Agreement

#### i. The Covenant Not to Compete is Enforceable

A party seeking a preliminary injunction must make a "clear showing" of likelihood of success, but the movant is not required to show a certainty of success. *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013). Under North Carolina law, the elements for a breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract. *Atlantic Pinstriping, LLC v. Atlantic Pinstriping Triad, LLC*, 2016 WL 5376294, * 4 (W.D.N.C. Sept. 23, 2016).[2]

In North Carolina, a noncompetition covenant is valid and enforceable if it is (1) in writing; (2) made a part of the employment contract; (3) based on valuable consideration; (4) reasonable as to time and territory; and (5) not against public policy. *See Milner Airco, Inc. v. Morris*, 111 N.C. App. 866, 869, 433 S.E.2d 811, 813 (1993). Each of these criteria is met here.

---

[2] The Employment Agreement provides that North Carolina law governs. (*Verified Compl.* [Dock. # 1-1 at 22 (Section 18(a)).])

**First**, Defendant's noncompetition promises are in writing and part of the Agreement made in connection with her employment, thus satisfying the first two requirements.

**Second**, the Agreement is supported by consideration. Noncompetition covenants that are signed after the employment relationship is established require separate consideration to support the covenant, such as a pay raise or other benefits or advantages to the employee. *Calhoun v. WHA Med. Clinic, PLLC*, 178 N.C. App. 585, 597, 632 S.E.2d 563, 571 (2006). Here, in April 2016, in exchange for signing the Agreement, Northrop was promoted to Service Center Manager of the Syracuse Facility and received an annual salary increase of $9,285.12. Without signing the Agreement, Northrop would not have otherwise been entitled to receive these benefits. *See Hejl v. Hood, Hargett & Assoc.* 196 N.C. App. 299, 305, 674 S.E.2dd 425 (N.C. App. 2009).

**Third**, the Agreement is reasonable as to time and territory under well-established North Carolina law. *See Okuma Am. Corp. v. Bowers*, 181 N.C. App. 85, 91, 638 S.E.2d 617, 621 (2007) (addressing nearly identical restrictions). A court should consider the time and territory restrictions in tandem. *See Farr Assocs, Inc.. v. Baskin*, 138 N.C. App. 276, 280, 530 S.E.2d 878, 881 (2000) (a "longer period of time is acceptable where the geographic restriction is relatively small, and *vice versa*").

Here, a "six-month restriction is well within the established parameters for covenants not to compete in this State." *Okuma*, 181 N.C. App. at 89, 638 S.E.2d at 620. The covenant not to compete contains a three-tiered territory restriction and includes anywhere in the United States where XPO performs services. Here, given the short duration of the restriction, the undisputed nationwide scope of XPO's LTL network and Northrop's knowledge of Confidential Information—including the proprietary materials she unlawfully took from XPO—that can be used to compete against XPO anywhere in the country, these time and territory restrictions are

9

reasonable under well-established North Carolina law. *Byrne Aff.* ¶¶ 6-8; *see, e.g., Okuma*, 181 N.C. App. at 92, 638 S.E.2d at 622; *Market America, Inc. v. Christman-Orth*, 135 N.C. App. 143, 520 S.E.2d 570 (1999) (six-month restriction that covered the United States); *ABT, Inc. v. Juszczyk* 2010 WL 3156542, * 8 (W.D.N.C. Aug. 10, 2010) (nationwide territory); *Agdata, LP v. Gupta*, 2008 WL 4811674, *2 (W.D.N.C. Oct. 31, 2008) (nationwide territory).

In *Carlson Environmental Consultants, PC v. Slayton*, 2017 WL 4225993, *8 (W.D.N.C. Sept. 21, 2017), this Court found a nationwide restriction in a noncompete was reasonable in granting a motion for preliminary injunction. This Court observed that "[t]he nationwide geographic territory in [defendant's] non-compete is therefore reasonable and enforceable, as it corresponds to the area in which [the former employer] conducts its business and where its customers are located." *Id.* The same conclusion applies on all fours here.

**Fourth**, XPO has a legitimate business interest in protecting its Confidential Information, customer relationships, and goodwill. In the Agreement, Northrop explicitly acknowledged that she would receive Confidential Information in the course of her employment with XPO and that her noncompete obligation was necessary to protect XPO's Confidential Information, business and goodwill. (*Verified Compl.* Exhibit 1 [Dock. # 1-1 at 16 and 23 ("Background Information" and Section 7(k)]).

As this Court has previously observed, longstanding precedent from the North Carolina appellate courts holds that confidential information and goodwill are legitimate interests that support enforcement of noncompetition restrictions. *See Carlson Environmental Consult.*, 2017 WL 4225993, at *7 (citing North Carolina case law). In previous actions, the State Court, including the North Carolina Business Court, has recognized the legitimacy of XPO's interests supporting noncompetition and nonsolicitation obligations. *See, e.g., XPO Logistics, Inc. v. Anis*,

2016 NCBC 52 at *7 (July 12, 2016) (finding that XPO had a legitimate business interest in protecting its Confidential Information).

In addition, the non-compete restriction is limited to performing services in an area, division or segment of a Competing Business that competes with XPO. Such a restriction is fully consistent with applicable North Carolina precedent considering similar language. *See, e.g., Okuma*, 181 N.C. App. at 92, 638 S.E.2d at 622 (approving restriction from employment with competitor unless "in an area of the competitor's business which does not compete" with former employer). Significantly, in prior actions involving XPO's employment agreements, North Carolina state courts applying North Carolina law have issued injunctive relief restraining a defendant from employment with a competitor except in an "area, division or segment" that does not compete with XPO. *See, e.g.* Exhibit 1 (Guilford County Superior Court, involving XPO's predecessor, New Breed, Inc); Exhibit 2 (Mecklenburg County Superior Court); Exhibit 3 (Mecklenburg County Superior Court).

In *Carlson Environmental Consultants,* this Court issued a preliminary injunction enforcing a noncompetition covenant that included a similar restriction. In finding that the plaintiff had met its burden of showing the two-year, nationwide restriction was enforceable and that the defendant had breached the contract, the Court's order for injunctive relief included a provision restraining defendant from becoming employed except in an area of the Competitor's business which does not compete with the Employer." 2017 WL 4225993, at * 12; *see also Latino Communications, LLC v. Norsan Broadcasting*, 2011 WL 6884232, *4 (W.D.N.C. Oct. 26, 2011) (following *Okuma*).

Here, as in the decisions cited above, Northrop's restriction is confined to an area, division or segment that competes with XPO and is thus valid and enforceable. Further, the evidence

11

establishes that Northrop's roles either as Terminal Manager or Special Projects Manager with Saia would be substantially similar to her position with XPO and would involve direct competition with XPO. (*Byrne Aff.* ¶¶ 6-7; *Riggins Aff.* ¶ 4). Indeed, the proprietary materials she took after accepting a position with Saia demonstrate unequivocally that she intended to do just that. (*Verified Compl.* ¶¶ 34-41 [Dock. # 1-1]). These materials provided her with a "starter kit" to open up and manage a new facility, and she has acknowledged that she took these materials to help her in her role at Saia. (*Id.* ¶ 39; *Riggins Aff.* ¶ 6).

### ii. Northrop Has Breached Her Promise to Refrain from Competing.

Northrop has indisputably breached the noncompetition provision. Saia and XPO are in direct competition. (*Verified Compl.* ¶ 8 [Dock. # 1-1].) As discussed above and as the evidence shows, whether as Terminal Manager in Syracuse or Special Projects Manager in Newburgh, Northrop would be working in an area that competes with XPO. (*Id.*, *Riggins Aff.* ¶ 4; *Byrne Aff.* ¶¶ 6-8). Further, Northrop's unlawful misappropriation of XPO's Confidential Information establishes that she intended to compete with XPO using XPO's own proprietary methods. Indeed, her role as Special Projects Manager would have involved multiple facilities, increasing the harm that she could cause to XPO in that role. (*Byrne Aff.* ¶ 6.) Accordingly, XPO's evidence establishes its likelihood of success in showing that Northrop's employment with Saia violated her covenant not to compete.

### iii. Northrop Also Failed to Keep Her Promise to Protect XPO's Confidential Information from Improper Disclosure and Misuse.

Northrop also breached the Agreement by secretly stealing XPO's Confidential Information to benefit Saia. Her Agreement with XPO includes a confidentiality provision, which requires Northrop to use XPO's Confidential Information only for XPO's benefit, and to refrain

from, at any time, directly or indirectly using, disclosing, or copying XPO's Confidential Information or assisting any other person or entity in doing so. (*Verified Compl*. ¶ 15 [Dock. #1-1].) In addition, the Agreement requires that upon termination of employment, Northrop must promptly return all of XPO's Confidential Information and property, including all information stored in electronic form, to XPO by the last day of her employment. (*Id*. ¶ 16.)

As described above, Northrop sent multiple emails from her company email account containing XPO's confidential and proprietary materials to her personal email account when she accepted a position with a direct competitor. The Confidential Information falls squarely within the prohibitions of the restrictive covenants in the Agreement. By taking without authorization XPO's Confidential Information for the benefit and use by XPO's direct competitor, Saia, and by failing to return XPO's Confidential Information, Northrop breached the confidentiality and return-of-property covenants in her Agreement. *See Edgewater Services, Inc. v. Epic Logistics, Inc.*, 217 N.C. App. 399, 720 S.E.2d 30 (2011).

North Carolina courts routinely provide injunctive relief to former employers in similar situations, enjoining former employees from using or disclosing the former employer's confidential and proprietary information in violation of their employment agreements. *See, e.g. Campbell Alliance Group, Inc. v. Dandekar*, 2014 WL 51241 (E.D.N.C. Jan. 7, 2014) (granting injunctive relief to former employer when former employee retained confidential information on an external storage device following termination of his employment and downloaded that information to another computer in violation of non-disclosure and return-of-property covenants); *Ge Betz Inc. v. Conrad*, 2007 WL 7646900 ¶10 (N.C. Super. Apr. 25, 2007) (granting injunctive relief to former employer enjoining former employees' use of confidential and proprietary information in violation of their employment agreements).

13

### B. A Preliminary Injunction is Necessary to Avoid Irreparable Injury

"Irreparable injury includes injury for which a monetary award would be inadequate, or for which a monetary award is incalculable. Irreparability of harm includes the impossibility of ascertaining with any accuracy the extent of the loss, for example the inability to calculate the extent of sales the plaintiff's competition will cause it to lose, and the 'far reaching effects upon its good will.'" *Carlson Environmental Consult.*, 2017 WL 4225993, at *10 (quoting *Blackwelder Furniture Co. v. Seilig Mg. Co*, 550 F.2d 189, 197 (4th Cir. 1977)).

Here, the evidence establishes that XPO has suffered, and will continue to be threatened with suffering, actual and imminent harm without an injunction to enforce Northrop's contractual obligations. Northrop explicitly acknowledged in her Agreement that a violation of her noncompetition provisions would cause harm to XPO and necessitate injunctive relief. [Dock. #1-1 at 23 (Section 19).] The significance of this injunctive relief is heightened substantially by Northrop's repeated breaches of the Agreement and her secret misappropriation of XPO's proprietary files. While XPO understands from Saia that it terminated her, it did so only after the TRO was entered.

Based on Northrop's prior violations of the Agreement, an injunction prohibiting Northrop from using or disclosing XPO's Confidential Information, or assisting any person in doing so, and enforcing Northrop's noncompetition, confidentiality, and return-of-company property covenants is the only effective way to preserve and enforce XPO's rights. *Ge Betz Inc.*, 2007 WL 7646900 ¶ 24 (granting injunctive relief to former employer against former employee). In the face of substantial evidence of Northrop's breaches of the Agreement and her brazen willingness to take XPO's Confidential Information, if Northrop is not enjoined, she will be in a position to continue to unfairly compete against XPO.

### C. The Balance of the Equities Weigh in XPO's Favor.

The balance of the equities also weighs strongly in favor of a motion for preliminary injunction. *See Winter*, 555 U.S. at 20, 129 S. Ct. at 374. In particular, in addition to going to work for a direct competitor of XPO to assist it in establishing new competing facilities, Northrop secretly took XPO's proprietary information and materials to assist with that effort. Further, rather than immediately resigning upon accepting employment with Saia on May 29, 2019, she continued to work at XPO for several more days, allowing her access to these materials.

Northrop specifically acknowledged in the Agreement that, based on her experience and capabilities, compliance with the noncompetition obligation would not prevent her from earning a livelihood to support herself and her dependents. [Dock # 1-1 at 20 (Section 7(k).] *See Phillips Elec. N. A. Corp. v. Hope*, 631 F.Supp.2d 705, 709 (M.D.N.C. 2009). Granting XPO's motion for an injunction "would only require [Northrop] to do that which [she] agreed to do in the [Agreement] and would prevent [her] from continuing to harm [XPO]." *Carlson Environmental Consult.*, 2017 WL 4225993, at * 11. The damage that would result if Northrop is allowed to violate her noncompetition covenant outweighs any harm to her as a result of compliance with her contractual obligations. *Id*. Further, any harm is a direct consequence of her own failure to abide by her agreement with XPO. *Id.*.

### D. The Public Interest Supports an Injunction.

It is in the public interest for Courts to enforce agreements, such as the Agreement here, that private parties enter into knowingly and voluntarily. *See Carlson Environmental Consult.*, 2017 WL 4225993, at * 11 ("Granting a preliminary injunction is in the public interest, because it is beneficial to the public for Courts to enforce agreements that private parties enter into knowingly and voluntarily."); *Phillips Elecs*, 631 F.Supp.2d at 724 (holding that public interest is served by

15

Case 3:19-cv-00348-MOC-DSC   Document 4   Filed 07/24/19   Page 15 of 17

ensuring that contracts are enforced and preventing unethical business behavior). The North Carolina Supreme Court has held that "it is as much a matter of public concern to see that valid [covenants] are observed as it is to frustrate oppressive ones." *United Labs, Inc,* 322 N.C. at 650, 370 S.E.2d at 380.

XPO has a legitimate interest in being able to share confidential information with its employees without fearing that it will end up in the hands of a competitor. *Carlson Environmental Consult.*, 2017 WL 4225993, at * 11 (citing *Travenol Labs., Inc. v. Turner*, 30 N.C. App. 686, 691, 228 S.E.2d 478, 483 (1976)). And the interest in enforcing parties' agreements outweighs Northrop's desire to be employed in a manner that contravenes the restrictive covenant. *See Superior Performers, Inc. v. Meaike*, 2014 WL 1412434, *16 (M.D.N.C. April 11, 2014). The public interests strongly support the Court's issuance of a preliminary injunction enforcing Northrop's contractual obligations.

## III. CONCLUSION

For the reasons set forth above, XPO requests that the Court grant XPO's Motion for Preliminary Injunction.

### WORD COUNT CERTIFICATION

This brief conforms with the word count limitation as set forth in the Initial Scheduling Order.

This 24th day of July 2019.

/s/ Douglas M. Jarrell_____
David C. Wright, III
N.C. Bar No. 11161
dwright@robinsonbradshaw.com

Douglas M. Jarrell
N.C. Bar No. 21138
djarrell@robinsonbradshaw.com

Gabriel Wright
N.C. Bar No. 52472
gwright@robinsonbradshaw.com

**Robinson, Bradshaw & Hinson, P.A.**
101 North Tryon Street, Suite 1900
Charlotte, North Carolina 28246-1900
Telephone: (704) 377-2536
Facsimile: (704) 378-4000

*Attorneys for Plaintiff*