# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NORTH CAROLINA
# Civil Action No.: 3:19-cv-00348-FDW-DSC

| | |
|---|---|
| XPO LOGISTICS, INC.,<br><br>                      Plaintiff,<br><br>v.<br><br>JESSICA NORTHROP,<br><br>                      Defendant. | **ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

THIS MATTER is before the Court on the Motion for Preliminary Injunction [Dock. No. 3] filed by Plaintiff XPO Logistics Inc. ("XPO") pursuant to Federal Rule of Civil Procedure 65 (the "Motion"). In its Motion, XPO seeks to preliminarily enjoin its former employee, Defendant Jessica Northrop ("Northrop"), from violations of her noncompetition, confidentiality and return-of-company property covenants set forth in her agreement with XPO. On July 29, 2019, this Court held a hearing for the presentation of arguments and evidence by the parties. At the conclusion of the hearing, the Court issued an oral ruling that it would grant the motion, with a written order to follow. The Court has reviewed the pleadings, the evidence of record, the arguments presented during the hearing and applicable law. For the reasons set forth below, the Court **GRANTS** XPO's motion for preliminary injunction as follows:

## I. FINDINGS OF FACT

1. For purposes of addressing Plaintiff's Motion for Preliminary Injunction, the evidence before the Court thus far shows the following facts.[1]

---

[1] These findings of fact are based on the limited record before the Court and is not intended to be binding for purposes of ruling on dispositive motions that may arise and/or trial.

2. XPO is a global leader in less-than-truckload ("LTL") transportation and one of North America's largest LTL providers. XPO's LTL coverage extends to every state, encompassing 99% of all U.S. zip codes, and into Mexico, Puerto Rico, and Canada. (*Verified Compl*. ¶ 12 [Dock. #1-1].) It operates a transportation network that includes over 75,000 next-day and two-day lanes and offers multimodal transportation and logistics solutions to its customers through the use of data-driven reporting and custom analytics. (*Id.* ¶ 13.)

3. Northrop has worked in the LTL business for XPO or its predecessor since 2009, with access to the company's Confidential Information. (*Id.* ¶ 21.) In April 2016, Northrop accepted a transfer from her position as Service Center Manager of a smaller facility to a larger XPO facility in Syracuse, New York. In connection with this promotion and transfer, Northrop entered into the Confidential Information Protection Agreement (the "Agreement"), which is attached as Exhibit 1 to the Verified Complaint. (*Id.*) She also received an annual salary increase of $9,285.12 as consideration for signing the Agreement. (*Id.*) Northrop served as the Service Center Manager of the Syracuse Facility from April 2016 until she resigned in June 2019. (*Id.* ¶¶ 21, 41.)

4. In Section 1 of the Agreement, Northrop promised to use XPO's Confidential Information only for XPO's benefit and that, other than as required to fulfill her duties for XPO, she would not, at any time, directly or indirectly use, disclose, or copy XPO's Confidential Information or assist any other person or entity to do so. (*Id*. ¶ 15 and Exhibit 1 [Dock. #1-1].) As defined in the Agreement, "Confidential Information" means information, written (whether generated or stored on magnetic, digital, photographic or other media) or oral, not generally known, or proprietary to XPO about its business, affairs, operations, products, services, client and carrier lists, pricing strategies, operating processes, business methods and procedures, information

2

technology and information-gathering techniques and methods, business plans, financial affairs and all other accumulated data, listings or similar recorded matter useful in the business of the company. (*Id*. ¶ 17 and Exhibit 1 (Section 20).)

5. In Section 2 of the Agreement, Northrop promised to return all XPO Confidential Information and company property (tangible or intangible), in her possession or control, including any documents and data, no later than the last day of her employment. (*Id*. ¶ 16 and Exhibit 1.)

6. In Section 7 of the Agreement, Northrop agreed that, while employed with XPO and for a period of six months after termination of employment, within the "Restricted Territory," she would not "perform any services, whether as an employee, agent or independent contractor for a Competing Business [as defined in Section 7(c) of the Agreement] in an area, division or segment of the Competing Business that competes in any way with any of [XPO's] businesses." (*Id*. ¶ 19 and Exhibit 1.)

7. "Restricted Territory" is defined in the Agreement as (i) the territory within 100 miles from the principal office at which Northrop was employed by XPO; (ii) the territory within 50 miles from any other XPO offices in the United States, Canada and Mexico; and (iii) any state or province in the United States, Canada and Mexico in which XPO's customers are located or XPO performs services for or on behalf of its customers or carriers. (*Id*. ¶ 16 and Exhibit 1 (Section 7).)

8. As the Service Center Manager for the Syracuse Facility, Northrop was responsible for the overall management and performance of the facility and its employees. (*Id.* ¶ 22.) Her duties included selling XPO's services to businesses and managing the interactions with those customers; resolving customer concerns; and managing all the facility's employees, costs, maintenance, supplies, manpower planning, and customer claims. (*Id.*) She also was charged with

3

implementing new strategies and initiatives, managing programs and process improvements to ensure continued business growth and long-term relationships with customers. (*Byrne Aff.* ¶ 3 [Dock. No. 5].) In addition, XPO trains its Service Center Managers to identify opportunities to expand and cross-sell business with customers who may have needs for additional transportation solutions. (*Id.* ¶ 4.)

9. Through her employment, Northrop obtained access to a wide array of XPO's proprietary and confidential information regarding XPO's LTL business and customers, including business strategy, pricing, contracts, employee compensation, proprietary management and operational processes, competitive offerings, technology tools related to routing systems, business intelligence systems, and safety systems; confidential freight movements and procedures; and corporate security procedures. (*Verified Compl.* ¶¶ 24-25 [Dock. #1-1].) These technology tools and information provide XPO with advantages over its competitors in the LTL industry. (*Id.*)

10. Through regularly recurring meetings with other managers and members of XPO's leadership team, Northrop also acquired significant Confidential Information about XPO's LTL business outside of the Syracuse Facility. (*Id.* ¶¶ 26, 27.) For example, in connection with her weekly meeting with other managers in her district—comprised of 20 facilities across seven states—XPO provided Northrop with a confidential "Business Information Report" with detailed data regarding revenue, tonnage, and yield for all the facilities in her district. (*Id.* ¶ 26.) Northrop also had access to confidential financial and operational data for every LTL terminal in XPO's East region, which is one of XPO's four LTL regions. (*Id.* ¶ 28.) She also participated in a monthly "manager meeting" at which XPO's executive leadership reviewed the financial performance and goals for XPO's nationwide LTL business. (*Id.*) Further, she obtained exposure to XPO's pricing

4

and potential business opportunities across XPO's range of transportation solutions. (*Byrne Aff.* ¶ 4 [Dock. No. 5].)

11. On May 29, 2019, while working at XPO's Syracuse Facility, Northrop accepted an offer from Saia LTL Freight ("Saia") to serve as the Terminal Manager for a new terminal it was opening in Syracuse. (*Verified Compl.* ¶ 32 [Dock. No. 1-1].) Saia is a direct competitor of XPO. According to its public filings, Saia recently initiated a strategy to begin serving new markets in the Northeast by opening new terminals in that region. (*Id.* ¶ 31.)

12. The same day she accepted the offer from Saia—and while still employed at XPO—Northrop used her company email account and secretly emailed multiple XPO files containing proprietary management tools and Confidential Information to her personal Yahoo email account. (*Id.* ¶¶ 1, 33.) The materials that Northrop sent to herself including the following files:

    (a) "Third Quarter Update.pptx" (PowerPoint presentation)

    (b) "Q4Playbook.xlsx" (Excel spreadsheet)

    (c) "Conference Report" form

    (d) "SWFL matter.xlsx" (Excel spreadsheet)

    (e) "SCM Responsibilities and Expectations.xlsx" (Excel spreadsheet)

    (f) "Pre-shift template.xlsx" (Excel spreadsheet)

    (g) "Copy of DockXSY.xls" (Excel spreadsheet)

    (h) "XSY Employee_Training_Record_Spreadsheet_xlsx" (Excel spreadsheet)

(*Id.* ¶ 34.)

13. The documents Northrop sent to herself constituted confidential and proprietary information about XPO's business, including its operations, business strategy, customers, and financial information. (*Id.* ¶ 35.) For example, the "Third Quarter Update" is a proprietary tool

5

that XPO uses to internally communicate confidential operational and performance information, such as competitively sensitive information about the company's incentive plan for employees. (*Id.* ¶ 36.) The "Q4 Playbook" is a proprietary management tool that is designed to identify and execute strategies and actions to drive improvements across all aspects of an LTL facility's business. (*Id.* ¶ 37.) XPO developed and uses these management tools to provide itself a competitive advantage in the LTL industry. (*Id.*)

14. On June 3, 2019, Northrop resigned from XPO. (*Id.* ¶ 41.) By letter dated June 13, 2019, XPO demanded that Northrop comply with her obligations under the Agreement. (*Id.* ¶ 44 and Exhibit 2.) Northrop did not respond. (*Id.*)

15. At some point, Saia changed Northrop's position from Terminal Manager for the Syracuse facility to "Special Projects Manager" and relocated her to its LTL facility in Newburgh, New York. (*Riggins Aff.* ¶ 3 [Dock. No. 6].) Northrop's position as Special Projects Manager involved assisting the Newburgh facility and other LTL terminals in her district with "operational and office issues" to get the facilities opened and running. (*Id.* ¶ 4.) Northrop's responsibilities and duties as Saia's Special Projects Manager were similar to those she had as Service Center Manager for XPO except that her position with Saia involved newly opened terminals. (*Id.*)

16. Particularly in light of the confidential materials she took from XPO that relate to XPO's proprietary management and operational processes, Ms. Northrop's role in assisting the operations at multiple facilities would allow her to use XPO's information to improperly compete with XPO. (*Byrne Aff.* ¶ 6 [Dock. No. 5].) These operational processes and analytics for its LTL facilities provide XPO with a competitive advantage and, because this information is generally applicable to any LTL terminal, it could be used to compete unfairly anywhere within XPO's national LTL network – and not just the facility location where Northrop was employed. (*Id.* ¶ 7.)

6

17. On June 28, 2019, XPO filed a Verified Complaint against Northrop in the Superior Court of Mecklenburg County, North Carolina (the "State Court") seeking preliminary and permanent injunctive relief. [Dock. #1-1].[2] On July 1, 2019, the State Court entered a Temporary Restraining Order enjoining Northrop from: (i) violating the noncompetition covenant set forth in the Agreement; (ii) violating the confidentiality covenants contained in the Agreement; and (iii) accessing, disclosing, destroying, removing, transferring, copying, sharing, or altering any documents or tangible things constituting Confidential Information or that belong to XPO, including computer files and other electronic data.

18. The Order also compelled Northrop to provide to XPO within ten days all of her electronic devices, including personal media and storage drives, that currently or previously contained Confidential Information, other documents, or information relating to XPO's business, and to return immediately any Confidential Information to XPO. The Court understands that XPO engaged a forensic inspector to inspect Northrop's iPad, phone and personal email account. An inspection protocol agreed to by counsel provides that the inspector will identify the XPO Confidential Information and will remove such materials from Northrop's personal Yahoo email account, retaining an image for evidentiary purposes.

19. On July 2, 2019, following receipt of the Temporary Restrating Order, Saia terminated Northrop's employment. (*Northrop Aff*., Doc. No. 7-1, p. 3). At the time of the Court's hearing on July 29, 2019, Northrop remained unemployed. (Id.)

---

[2] In the Agreement, Northrop consented to the exclusive jurisdiction of state and federal courts located in Mecklenburg County, where XPO has a substantial presence. (*Verified Compl.* ¶ 11 and Exhibit 1 (Section 18(d) [Dock. No. 1-1].)

20. On July 19, 2019, prior to the hearing in State Court on XPO's motion for preliminary injunction, Northrop filed a notice of removal to this Court pursuant to 28 U.S.C. § 1332(a). [Dock. No. 1.]

21. Pursuant to the Court's July 22, 2019 Order and Notice of Hearing [Dock. No. 2], XPO refiled the Motion in this Court on July 24, 2019 [Dock. No. 3].

## II. CONCLUSIONS OF LAW

Based on the above findings and the evidence of record, the Court makes the following conclusions of law.

22. In order to obtain a preliminary injunction, XPO must establish that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 374 (2008). For the reasons set forth below, XPO has established all four requirements needed to obtain a preliminary injunction to enforce Northrop's contractual obligations and protect XPO's rights.

### A. LIKELIHOOD OF SUCCESS ON THE MERITS

23. A party seeking a preliminary injunction must make a "clear showing" of likelihood of success, although the movant is not required to show a certainty of success. *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013). Here, XPO is likely to succeed on the merits of its breach of contract claims because the Agreement is valid and enforceable and XPO has met its burden to show that Northrop has breached the Agreement.

24. Under North Carolina law, the elements for a breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract. *Atlantic Pinstriping, LLC v. Atlantic*

*Pinstriping Triad, LLC*, 2016 WL 5376294, * 4 (W.D.N.C. Sept. 23, 2016) (citing *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000)).[3]

25. In North Carolina, a noncompetition covenant is valid and enforceable if it is (1) in writing; (2) made a part of the employment contract; (3) based on valuable consideration; (4) reasonable as to time and territory; and (5) not against public policy. *See Milner Airco, Inc. v. Morris*, 111 N.C. App. 866, 869, 433 S.E.2d 811, 813 (1993). The noncompetition provision in the Agreement meets each of these criteria.

26. First, Plaintiff has made a clear showing of likelihood of success in establishing that Defendant's noncompetition promises are in writing and part of the Agreement made in connection with her employment, thus satisfying the first two requirements.

27. Second, Plaintiff has made a clear showing of likelihood of success in establishing that the Agreement is supported by consideration. Noncompetition covenants that are signed after the employment relationship is established require separate consideration to support the covenant, such as a pay raise or other benefits or advantages to the employee. *Calhoun v. WHA Med. Clinic, PLLC*, 178 N.C. App. 585, 597, 632 S.E.2d 563, 571 (2006). Here, in April 2016, in exchange for signing the Agreement, Northrop was promoted to Service Center Manager of the Syracuse Facility and received an annual salary increase of $9,285.12. Without signing the Agreement, Northrop would not have otherwise been entitled to receive these benefits. *See Hejl v. Hood,*

---

[3] The Employment Agreement provides that North Carolina law governs. (*Verified Compl*. Exhibit 1 (Section 18(a)) [Dock. # 1-1].) "When sitting in diversity jurisdiction, federal courts must apply the conflict of law rules of the state in which they sit." *Legacy Data Access, LLC v. MediQuant, Inc.*, 2017 WL 6001637, *11 (W.D.N.C. December 4, 2017). As this Court has observed, the North Carolina Supreme Court has held that, where parties to a contract have agreed that a given jurisdiction's substantive law shall govern, such a contractual provision will be given effect. *Id* (citing *A.E.P. Indus., Inc. v. McClure*, 308 N.C. 393, 402, 302 S.E.2d 754, 760 (1983)).

*Hargett & Assoc. Inc.*, 196 N.C. App. 299, 305, 674 S.E.2dd 425 (N.C. App. 2009) (noting that North Carolina Courts have found payments of $500 and $100 were sufficient consideration for noncompetition agreements).

28. Third, Plaintiff has made a clear showing of likelihood of success in establishing that the Agreement is reasonable as to time and territory under well-established North Carolina law. *See Okuma Am. Corp. v. Bowers*, 181 N.C. App. 85, 91, 638 S.E.2d 617, 621 (2007) (addressing nearly identical restrictions). A court should consider the time and territory restrictions in tandem. *See Farr Assocs., Inc.. v. Baskin*, 138 N.C. App. 276, 280, 530 S.E.2d 878, 881 (2000) (a "longer period of time is acceptable where the geographic restriction is relatively small, and *vice versa*").

29. A "six-month restriction is well within the established parameters for covenants not to compete in this State." *Okuma*, 181 N.C. App. at 89, 638 S.E.2d at 620. The covenant not to compete contains a three-tiered territory restriction and includes anywhere in the United States where XPO performs services.

30. In *Carlson Envtl. Consultants, PC v. Slayton*, 2017 WL 4225993, *8 (W.D.N.C. Sept. 21, 2017), this Court found a nationwide restriction in a noncompete was reasonable in granting a motion for preliminary injunction. This Court observed that "[s]imilar territorial restrictions have consistently been deemed valid and enforceable by our courts." *Id*. (citing cases). This Court held that "[t]he nationwide geographic territory in [defendant's] non-compete is therefore reasonable and enforceable, as it corresponds to the area in which [the former employer] conducts its business and where its customers are located." *Id*.

31. Here, given the short duration of the restriction, the undisputed nationwide scope of XPO's LTL network and Northrop's knowledge of Confidential Information—including the

10

proprietary materials she took from XPO—that can be used to compete against XPO *anywhere in the country*, these time and territory restrictions are reasonable under North Carolina law. *Byrne Aff.* ¶¶ 6-8; *see, e.g., Okuma*, 181 N.C. App. at 92, 638 S.E.2d at 622; *Market America, Inc. v. Christman-Orth*, 135 N.C. App. 143, 520 S.E.2d 570 (1999) (six-month restriction that covered the United States); *ABT, Inc. v. Juszczyk* 2010 WL 3156542, * 8 (W.D.N.C. Aug. 10, 2010) (nationwide territory); *Agdata, LP v. Gupta*, 2008 WL 4811674, *2 (W.D.N.C. Oct. 31, 2008) (nationwide territory). Although Northrop contends the proprietary information has been wiped from her email system, her knowledge of and prior utilization of these business tools applicable to any competing business in any competing area, combined with her apparent intention to reference them and access them post-employment, demonstrates the reasonableness of the nationwide scope under these facts.

32. Fourth, Plaintiff has made a clear showing of likelihood of success in establishing that XPO has a legitimate business interest in protecting its Confidential Information, customer relationships, and goodwill. In the Agreement, Northrop explicitly acknowledged that she would receive Confidential Information in the course of her employment with XPO and that her noncompete obligation was necessary to protect XPO's Confidential Information, business and goodwill. (*Verified Compl.* Exhibit 1 ("Background Information" and Section 7(k) [Dock. No. 1-1)].

33. As this Court has previously observed, longstanding precedent from the North Carolina appellate courts holds that confidential information and goodwill are legitimate interests that support enforcement of noncompetition restrictions. *See Carlson Environmental Consult.*, 2017 WL 4225993, at *7 (citing North Carolina case law); *see also, e.g., United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 651, 370 S.E.2d 375, 381 (N.C. 1988) ("[The] protection of customer

11

relationships and good will against misappropriation by departing employees is well recognized as a legitimate protectable interest of the employer.").

34. In addition, Plaintiff has made a clear showing of likelihood of success in establishing that the non-compete restriction is no wider in scope than necessary to protect XPO's business interests. Specifically, the noncompete restriction is limited to Northrop performing services for a Competing Business in an area, division or segment within the business that competes with XPO. Such a restriction is consistent with applicable North Carolina precedent considering similar language. *See, e.g., Okuma*, 181 N.C. App. at 92, 638 S.E.2d at 622 (approving restriction from employment with competitor unless "in an area of the competitor's business which does not compete" with former employer); *see also Carlson Environmental Consultants,* 2017 WL 4225993, at * 12 (issuing preliminary injunction enforcing a noncompetition covenant that included a restriction on becoming employed by a Competitor "unless Employee accepts employment in an area of the Competitor's business which does not compete with the Employer.").

35. The limitation on employment with a Competitor only in an area, division or segment of a Competing Business that *actually* competes with XPO distinguishes this restriction from cases holding that any restriction on association with a "similar" business is overbroad. *See, e.g., VisionAir, Inc. v. James*, 167 N.C. App. 504, 506, 606 S.E.2d 359, 361 (2004) (two-year restriction on "own[ing], manag[ing], be[ing] employed by or otherwise participat[ing] in, directly or indirectly, any business similar to Employer's"); *see also, e.g., Prometheus Grp. Enterprises, LLC v. Viziya Corp.*, 2014 WL 3854812, * 5 (E.D.N.C. Aug. 5, 2014) (holding that non-compete agreements that restrict any association with business that provides "similar services" is overbroad (citing *Okuma*)).

36. Further, the evidence currently before the Court establishes that Northrop's roles either as Terminal Manager or Special Projects Manager with Saia would be substantially similar to her position with XPO and would involve direct competition with XPO. (*Byrne Aff.* ¶¶ 6-7 [Dock. No. 5]; *Riggins Aff.* ¶ 4 [Dock. No. 6].) The proprietary materials she took after accepting a position with Saia demonstrate that she in fact intended to work in an area that competes with XPO. (*Verified Compl.* ¶¶ 34-41 [Dock. # 1-1].) As noted above in the findings of fact, these proprietary materials were not limited in applicability to only one position or one location.

37. Accordingly, XPO's noncompetition provision is necessary to protect its legitimate business interests and is sufficiently limited in scope.

38. XPO has met its burden to show that Northrop has breached her promise to refrain from competing. Saia and XPO are in direct competition. (*Verified Compl.* ¶ 8 [Dock. # 1-1].) As discussed above and as the evidence shows, whether as Terminal Manager in Syracuse or Special Projects Manager in Newburgh, Northrop would be working in an area that competes with XPO. (*Id.*, *Riggins Aff.* ¶ 4 [Dock. No. 6] ; *Byrne Aff.* ¶¶ 6-8 [Dock. No. 5].) Further, Northrop's transfers of XPO's Confidential Information to her personal account provide an indication of her intent to reference and use XPO's own proprietary methods after her employment with XPO. Her role as Special Projects Manager would have involved multiple facilities, increasing the harm that she could cause to XPO. (*Byrne Aff.* ¶ 6.) Accordingly, XPO's evidence establishes its likelihood of success in showing that Northrop's employment with Saia violated her covenant not to compete.

39. In addition to the covenant not to compete, Plaintiff has made a clear showing of likelihood of success in establishing that Northrop also breached the Agreement by taking XPO's Confidential Information. Her Agreement with XPO includes a confidentiality provision, which requires Northrop to use XPO's Confidential Information only for XPO's benefit, and to refrain

13

from, at any time, directly or indirectly using, disclosing, or copying XPO's Confidential Information or assisting any other person or entity in doing so. (*Verified Compl*. ¶ 15 [Dock. #1-1].) In addition, the Agreement requires that upon termination of employment, Northrop must promptly return all of XPO's Confidential Information and property, including all information stored in electronic form, to XPO by the last day of her employment. (*Id*. ¶ 16.)

40. In violation of these obligations, Northrop sent multiple emails from her company email account containing XPO's confidential and proprietary materials to her personal Yahoo email account when she accepted a position with a direct competitor. Northrop admits that she sent these emails to her personal account and that they included XPO's Confidential Information. (*Northrop Aff*. ¶ 8 [Dock. No. 7-1].) By taking without authorization XPO's Confidential Information for her benefit and/or the benefit of her new employer, Saia, and by failing to return XPO's Confidential Information, it appears that Northrop breached the confidentiality and return-of-property covenants in her Agreement.

B. IRREPARABLE HARM

41. Under Supreme Court precedent, the plaintiff must make a clear showing beyond a *possibility* of harm, instead showing that it is *likely* to be irreparably harmed absent preliminary relief. "Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction. . . . Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter, 555 U.S. at 22 (collecting cases; citations and quotations omitted; emphasis in original).

14

42. Generally, "irreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate." *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994) (citing *Danielson v. Local 275*, 479 F.2d 1033, 1037 (2d Cir. 1973)). Alternately, irreparable injury is satisfied "when the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill." *Id.* (citing *Merrill Lynch, Pierce, Fenner and Smith v. Bradley*, 756 F.2d 1048, 1055 (4th Cir. 1985)); *see also Carlson Environmental Consult.*, 2017 WL 4225993, at *10.

43. Here, the evidence establishes that irreparable injury is likely absent an injunction. XPO has suffered and will likely continue suffering, actual and imminent harm without an injunction to enforce Northrop's contractual obligations. While not binding on the Court, Northrop explicitly acknowledged in her Agreement that a violation of her noncompetition and confidentiality obligations would cause harm to XPO and necessitate injunctive relief. [Dock. #1-1 at 23 (Section 19).] The evidence shows Defendant sought and accepted employment with a competing business, in violation of the Agreement. Based on the record before the Court, it is likely she will continue to seek employment with a competing business absent an injunction. The significance of this injunctive relief is heightened by Northrop's apparent multiple breaches of the Agreement and her secret misappropriation of XPO's proprietary files. These breaches were ongoing until the State Court issued a TRO restraining such actions and Saia's termination of Northrop's employment.

44. Based on Northrop's prior violations of the Agreement, an injunction that continues the restraints in the TRO and prohibits Northrop from using or disclosing XPO's Confidential Information, or assisting any person in doing so, and enforcing Northrop's noncompetition, confidentiality, and return-of-company property covenants is the only effective way to preserve

15

and enforce XPO's rights. In the face of the evidence of Northrop's breaches of the Agreement, if Northrop is not enjoined, she will remain in a position to continue to unfairly compete against XPO. The fact that after the filing of this matter, the information has been forensically examined and removed from Northrop's email account indicates Northrop's willingness to comply with this provision; however, it does not moot the need for an injunction under these facts.

### C. BALANCE OF THE EQUITIES

45. The balance of the equities also weighs strongly in favor of a motion for preliminary injunction. *See Winter*, 555 U.S. at 20, 129 S. Ct. at 374. In particular, in addition to going to work for a direct competitor of XPO to assist it in establishing new competing facilities, Northrop took XPO's proprietary information and materials to assist with that effort. Further, rather than immediately resigning upon accepting employment with Saia on May 29, 2019, she continued to work at XPO for several more days, allowing her access to these materials.

46. Northrop specifically acknowledged in the Agreement that, based on her experience and capabilities, compliance with the noncompetition obligation would not prevent her from earning a livelihood to support herself and her dependents. [Dock # 1-1 at 20 (Section 7(k).] *See Phillips Elecs. N. Am. Corp. v. Hope*, 631 F.Supp.2d 705, 709 (M.D.N.C. 2009). Granting XPO's motion for an injunction "would only require [Northrop] to do that which [she] agreed to do in the [Agreement] and would prevent [her] from continuing to harm [XPO]." *Carlson Environmental Consult.*, 2017 WL 4225993, at * 11. The damage that would result if Northrop is allowed to violate her noncompetition covenant outweighs any harm to her as a result of compliance with her contractual obligations. *Id*. Further, any harm is a direct consequence of her own failure to abide by her agreement with XPO. *Id.*; *see also Meineke Car Care Centers, Inc. v. Catton*, 2010 WL 2572875, *4-5 (W.D.N.C. June 24, 2010).

16

D. THE PUBLIC INTEREST

47. It is in the public interest for courts to enforce agreements, such as the Agreement here, that private parties enter into knowingly and voluntarily. *See Phillips Elecs.*, 631 F.Supp.2d at 724 (holding that public interest is served by ensuring that contracts are enforced and preventing unethical business behavior). The North Carolina Supreme Court has held that "it is as much a matter of public concern to see that valid [covenants] are observed as it is to frustrate oppressive ones." *United Labs, Inc,* 322 N.C. at 649, 370 S.E.2d at 380.

48. XPO has a legitimate interest in being able to share confidential information with its employees without fearing that it will end up in the hands of a competitor. *Carlson Environmental Consult.*, 2017 WL 4225993, at * 11 (citing *Travenol Labs., Inc. v. Turner*, 30 N.C. App. 686, 691, 228 S.E.2d 478, 483 (1976)). The interest in enforcing parties' agreements outweighs Northrop's desire to be employed in a manner that contravenes the restrictive covenant. *See Superior Performers, Inc. v. Meaike*, 2014 WL 1412434, *16 (M.D.N.C. April 11, 2014). The public interests support the Court's issuance of a preliminary injunction enforcing Northrop's contractual obligations.

E. BOND

49. Rule 65 (c) provides: "The court may issue a preliminary injunction . . . *only* if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed.R.Civ.P. 65(c) (emphasis added). The Fourth Circuit has described this bond requirement as "mandatory and unambiguous." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999) (citing *Dist. 17, UMWA v. A & M Trucking, Inc.*, 991 F.2d 108, 110 (4th Cir. 1993)).

17

50. Notwithstanding Plaintiff's argument concerning Defendant's waiver of a bond in the Agreement, the Court finds under these facts and in light of the scope of the Agreement, a bond is appropriate and should be adequate to protect Defendant should it later be found that Defendant was wrongly enjoined or restrained.

51. The Court finds that Defendant's requested bond amount of $75,000 is appropriate and adequate.

### III. CONCLUSION

For the reasons set forth above, Plaintiff's Motion for Preliminary Injunction is **GRANTED** pursuant to Rule 65(a) of the Federal Rules of Civil Procedure and **IT IS HEREBY ORDERED** that during the pendency of this action:

(i) Defendant is enjoined and restrained from violating Section 7(b)(i) of the Agreement by performing services in the Restricted Territory for a Competing Business, including but not limited to Saia LTL Freight, in an area, division or segment that competes with XPO for the period ending six months from the termination of her employment at XPO;

(ii) Defendant is enjoined and restrained from violating the confidentiality covenant in Section 1 of the Agreement, including from using or disclosing XPO's Confidential Information or assisting any other person in doing so; and

(iii) Defendant is compelled to return immediately any XPO Confidential Information that remains in her possession or control.

**IT IS FURTHER ORDERED** that, pursuant to Federal Rule 65(d), this injunction binds Northrop, as well as her officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of this injunction.

**IT IS FURTHER ORDERED** that Plaintiff shall post a bond in the amount of $75,000.

**IT IS FURTHER ORDERED** that counsel for the parties shall immediately confer and submit a Rule26(f) certification within seven (7) days of this Order proposing a schedule for trial as soon as practically possible. In light of the injunction, the Court intends to place this case on the "fast track" schedule in issuing a case management order, and the proposed dates in the Rule 26(f) report may shorten but should not extend the date calculations set forth for a "fast track" case in the Court's Initial Scheduling Order, linked on the docket for this case on July 19, 2019.

**IT IS SO ORDERED.**

Signed: August 2, 2019

Frank D. Whitney
Chief United States District Judge